**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **DAISY TACKETT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. 16-cv-2266-JTM-GEB** |
| ) | |
| **UNIVERSITY OF KANSAS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**WITH SUPPORTING MEMORANDUM**

Defendant the University of Kansas moves this Court to dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6). Like Plaintiff's initial Petition, Plaintiff seeks damages from KU under Title IX primarily because she was raped in a KU student housing facility. That incident is tragic, but it is not one for which Title IX makes the University liable. KU may be liable for peer-on-peer harassment only where it has actual knowledge of ongoing sexual harassment and remains deliberately indifferent to it. Here there were no prior allegations of sexual assault committed by the Plaintiff's assailant. According to Plaintiff, when she reported the rape to KU one year later, KU investigated the matter, provided Plaintiff an escort on campus, issued a no-contact order, and the assailant agreed to be expelled. Those actions demonstrate KU's commitment to addressing cases of sexual violence – both in her case and others – while respecting the due process rights of students accused of such assaults. Plaintiff's new baseless and conclusory allegations of her Amended Complaint do nothing to change the legal result here, and Plaintiff's complaint should be dismissed.

## NATURE OF THE MATTER BEFORE THE COURT

Plaintiff was a KU student-athlete on the women's rowing team who reported she was raped in a KU student apartment building by a KU student-athlete on the men's football team.  She reported the incident to KU approximately one year after it occurred, shortly after another KU student told her she had been sexually assaulted by the same man.  Once KU had notice of the issue, it investigated.  During the investigation, KU provided Plaintiff with an escort on campus. It also issued a no-contact order to the alleged assailant.  Less than a week after Plaintiff returned to school after the winter semester break, she withdrew from KU.  With students (other than Plaintiff) back on campus, KU completed its investigation, and the assailant agreed to be expelled.[1] Plaintiff seeks to hold KU responsible for her rape because other rapes had reportedly occurred in KU student housing.  She also faults the time KU took to investigate and the actions taken by her rowing coaches and others at KU.  Plaintiff's claim should be dismissed because the facts in the Complaint demonstrate that KU was not deliberately indifferent to known acts of sexual harassment and retaliation.

## STANDARD OF REVIEW

Defendant brings this motion under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must determine whether the allegations of the complaint are sufficient to state a claim within the meaning of

---

[1]      First Amended Complaint at ¶90.  While for purposes of this motion, the Defendant will rely on the facts as pled by Plaintiff, it should be noted that in the letter notifying Plaintiff, the University told Plaintiff that the student had been "effectively permanently expelled from the University of Kansas.  He was withdrawn from the University effective March 17, 2016."  The University also went on to tell her that the former student was not eligible for readmission, he is banned from campus for ten years, a notation would be placed on his transcript, and that the no-contact directive to him remained in place.  *See* Exhibit 1; Exhibit 4 (business records affidavit in support of Exhibits 1-3); note 9, *infra*.

Rule 8.  Under the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562 (2007), the court must review the complaint to determine whether it "contains enough facts to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quotations omitted).  All well-pleaded factual allegations of the complaint are to be taken as true.  *Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013).  However, mere "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not be sufficient to defeat a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

A court "considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal,* 556 U.S. at 679.  Where the complaint makes no distinction as to what acts are attributable to whom, it may be impossible to determine what particular unlawful acts individuals are alleged to have committed, making dismissal appropriate.  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008).  Title IX cases are not immune from dismissal, and under the deliberate indifference standard developed by the Supreme Court, in appropriate cases, "there is no reason why courts, on a motion to dismiss … could not identify a response as not 'clearly unreasonable' as a matter of law."  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999).

## STATEMENT OF FACTS

Plaintiff's First Amended Complaint ("Complaint" or "FAC") reveals the following allegations, which are stated here as fact solely for the purpose of this Rule 12 motion.  For all other purposes, the University denies the allegations of the Complaint.

I.       **Reports of Sexual Misconduct at KU**

The University of Kansas is a state-supported institution of higher education in Lawrence, Kansas.   Complaint ¶4.   KU owns and manages student dormitories, including apartments commonly known as the Jayhawker Towers (the "Towers").   *Id.* at ¶11.   There have been the following public reports of sexual assaults at KU:

a.       In March of 2013, the KU public safety office investigated a report of a sexual assault of a female at the Towers.

b.       In October 2013, KU received a report of a rape of a female KU residence hall resident by a KU student.

c.       In April of 2014, a KU female residence hall student reported a rape at her residence hall.

d.       In October of 2014, two female KU residence hall students reported sexual assaults at their residence hall by a KU student and another man.

e.       In March of 2014, a KU football player was arrested after a 19-year-old KU student reported that she had been fondled while passed out in the parking lot of the Towers, where the football player was a resident.

f.       On November 10, 2014, the KU public safety office received a report of an alleged sexual battery at the Towers.

g.       In August, 2015, John Doe G sexually assaulted a second female KU rower at the Jayhawker Towers.

h.       In February of 2016, a KU football player was arrested held on suspicion of sexual battery and criminal restraint stemming from conduct at the Towers.

*Id.* at ¶11.   According to the 2015 Clery Report for KU,[2] in 2014 there were 14 rapes and 10 fondlings reported on campus, with 10 of the rapes and six of the fondlings occurring in KU's dorms; in 2013 there were 13 forcible sex offenses reported, with 9 of them occurring in KU's

---

[2]  The Clery Act Annual Security Report is available at www.ku.edu/safety and a copy of the report is available to the public at http://www.ku.edu/assets/documents/2015_Clery.pdf.

dorms; and in 2012, there were only 3 forcible sex offenses reported, with two in KU's dorms. *Id.* at ¶15.  Plaintiff alleges that KU had an official policy of placing KU athletes, in particular football players, in the Towers, where they would receive less supervision than other residence hall options. *Id.* at ¶86.  (Plaintiff does not, however, allege that she – a KU athlete – was placed in the Towers, and the Complaint is curiously silent on where she actually did live.)

The Complaint includes no allegations as to even suggest that the University was deliberately indifferent to these reports of sexual violence; it omits allegations regarding what the University did in response to any of these reports of sexual violence, who allegedly committed them, whether the reports were found to have merit, or whether the University imposed any disciplinary action against those reported to have committed such actions.  KU's website reports that between May 2012 and September 2015, KU has expelled 13 students for violations of its Sexual Harassment Policy, which would include acts of sexual violence.  Other students have faced other disciplinary action.  *See* https://studentaffairs.ku.edu/sanctions-violation-sexual-harassment-policy (last visited August 17, 2016).[3]

## II.   <u>Plaintiff is Raped by John Doe G as a Freshman in 2014</u>

Plaintiff Daisy Tackett was a female student and athlete at the University of Kansas on the women's rowing team; she enrolled at KU in the Fall of 2014. FAC ¶¶3, 17.  John Doe G was a KU student who lived in the Towers, and he was a KU football team member. *Id.* at ¶5.  In the 2014-2015 school year, following a Halloween party, Plaintiff went to the Towers, where a group of KU students and athletes had gotten together. *Id.* at ¶18.  John Doe G arrived at the gathering and appeared inebriated. *Id.* at ¶19.  John Doe G invited Plaintiff into his Towers apartment to watch a television show and then sexually assaulted her. *Id.* at ¶20.  Plaintiff remained in his

---

[3] The Court can take judicial notice of these reports.  *See infra*, note 9.

apartment until he left in the morning for football practice.  *Id*. at ¶21.  Plaintiff chose not to report the sexual assault at the time.  *Id*. at ¶22.  The Complaint does not (and cannot) allege that this gathering of students was part of any organized University activity.

## III.   Events on the Rowing Team in 2015-2016

Plaintiff returned to KU and the KU rowing team for the 2015-2016 academic year.  *Id*. at ¶24.[4]  The head coach of the KU rowing team was Rob Catloth (the "Head Coach"), and the assistant coach was Carrie Callen.  *Id*. at ¶25.  Plaintiff alleges that she witnessed the Head Coach make ongoing racial remarks about some rowers and numerous comments about the weight of the female athletes, calling some of the women "fat."  *Id*. at ¶26.[5]  "Many"[6] rowers had reported the Head Coach's alleged conduct to KU's Senior Woman Administrator Debbie Van Saun, whose responsibility includes overseeing Title IX compliance and gender equity principles.  *Id*. at ¶27. In early October of 2015, many of the KU rowing team members including Plaintiff met with a KU sports psychologist to discuss their concerns about the Head Coach.  *Id*. at ¶28.  At this meeting, rowing team members discussed fairness to players, racial comments, and comments

---

[4]  Despite her own sexual assault at the Towers in 2014 and the danger she now alleges they present, Plaintiff voluntarily moved into the Towers in 2015 for her sophomore year.  She previously lived at a privately-owned dorm off campus.

[5]  Plaintiff's First Amended Complaint now vaguely alleges for the first time that the Head Coach also was "expressing preferences for women who conformed with more traditional gender norms for the female body."  Plaintiff has failed to identify anything of this nature the Head Coach actually said, and this conclusory allegation should be disregarded.  It is also untrue, and the Head Coach and assistant coach deny it.

[6] In an attempt to avoid dismissal, plaintiff has amended this vague and conclusory allegation from "some" to "many," and but there still is no fact to support this vague allegation (i.e. names, dates, what was reported, etc.), and it should be disregarded for purposes of this Rule 12 motion.

{L0054036.5 }

about players' weight, as well as concerns that their reports to Van Saun regarding the Head Coach's conduct were ignored. *Id*. at ¶29.

The next week, following a competition, the Head Coach, the assistant coach, Van Saun, and the rowing team assistant coach told everyone on the team who participated in the team meeting about the Head Coach to remain and inform them of their complaints. *Id*. at ¶30. Many members of the rowing team repeated what they had discussed at the prior meeting. Plaintiff said the Head Coach should apply fair standards to the players and that he should not be as critical about players' weight. *Id*. at ¶31.

In her Complaint, Plaintiff seeks to beef up the allegations from her original Petition by claiming that "KU medical staff" (who plaintiff does not identify) had attempted to implement a policy that the Head Coach was to refer rowers to a nutritionist if their weight was a performance issue, and unidentified "KU officials" knew he was "not abiding by the policy." FAC ¶¶32-33. She then claims that "KU Officials" "deliberately chose" not to make the Head Coach comply with that policy and refused to investigate "any of the many" unspecified reports of the Coach's comments about women. Yet, Plaintiff's complaint also acknowledges that after the students purportedly met with Ms. Van Saun and a KU sports psychologist, an additional meeting was held with the coaching staff and players in which the Coach heard all of the players' concerns. *Id*. at ¶¶30-31. Plaintiff's complaint does not allege that following this meeting, those alleged comments and behaviors by Coach Catloth continued.

## IV.   <u>Another Rower is Sexually Assaulted by John Doe G</u>

Later in October of 2015, another KU rowing team member told Plaintiff that she had been sexually assaulted by John Doe G at the Towers, and that she had reported the assault to the police and to KU. Complaint ¶36. After learning of this assault, Plaintiff decided she needed to report

John Doe G's conduct from 2014; she first reported the rape to the rowing team's trainer, who referred her to a KU Athletics physician, who referred her to Van Saun; Van Saun set up a meeting between Plaintiff and a member of KU's Office of Institutional Opportunity & Access ("IOA"). *Id*. at ¶37.[7]  KU investigated Plaintiff's report of rape, and Plaintiff met with the IOA investigator and provided him details of her 2014 assault.  *Id*. at ¶44.  According to Plaintiff, KU did not immediately issue a "no contact" order to John Doe G; did not immediately suspend John Doe G pending the outcome of KU's investigation; and did not ban John Doe G from campus pending the outcome of KU's investigation.  *Id*. at ¶¶97(c-e).[8]

## V.      **Plaintiff Sees John Doe G on Campus**

At some unspecified time after meeting with the IOA investigator near the end of the 2015 fall semester, Plaintiff was leaving class at Blake Hall on the KU campus, a low-traffic area of campus, when she encountered John Doe G, whom she had never seen at that time and location of campus, staring her down.  FAC ¶45.  The experience unnerved her and caused her to experience panic, and that same day she reported the encounter to the IOA investigator.  *Id*. at ¶46.  Later that week, Plaintiff again saw John Doe G in front of Watson Library, again at a place and time she had never before encountered him, and he stared her down and called her a derogatory name.  *Id*. at ¶47.  Plaintiff again reported the encounter to the IOA investigator, and in response to her reports, KU provided an escort for Plaintiff from her class at Blake Hall to her next class at Wescoe

---

[7] Plaintiff also told the Assistant Coach that she had been raped, but like many of the events recited in the petition, she fails to specify when this event occurred.  Complaint at ¶40.

[8] Plaintiff's First Amended Complaint claims that the Head Coach knew in October 2015 – or earlier – about her rape, "on information and belief," that "other rowers and coaches" told him about it.  FAC ¶43.  It is inconceivable, much less plausible, how – prior to October 2015 "or earlier", as Plaintiff alleges – the Head Coach could have heard about an event that Plaintiff had yet to report.  These conclusory and contradictory allegations – for which there is no basis in fact – should be disregarded.

Hall.  *Id*. at ¶51.  After this event, KU did issue a no-contact order to John Doe G.  *Id.* at ¶50.

Plaintiff fails to allege when this occurred, describing it only as "months" after she reported her

assault.  That allegation is demonstrably false, and the plaintiff's failure to include the relevant

dates appears calculated – like her other omissions – to once again leave the court in the dark about

the reality of the University's response.  A copy of the no-contact order sent to the student and the

e-mail enclosing the same to the Plaintiff is attached as Exhibit 2, and because the plaintiff has

alleged the letter, this court can and should consider it under Rule 12.[9]  The no-contact order was

sent on December 9, 2015.  The Complaint alleges no further contact with John Doe G.[10]

   The last day of classes in the Fall 2015 semester was Thursday, December 10.  Finals took

place between Monday, December 14 and Friday, December 18, 2015.  Classes began again on

Tuesday, January 19, 2016.[11]

---

[9] *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013) (on a motion to dismiss a court may consider "documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes its authenticity; and matters of which a court may take judicial notice").  Moreover, the December 9, 2015 no-contact order to John Doe G states: "As we discussed in our December 2nd meeting, the easiest way to avoid any allegations of retaliation is to avoid any contact with Ms. Tackett," further evidencing that KU was not deliberately indifferent.

[10]  Plaintiff's new allegation that KU did, in fact, issue a no-contact order (which it did) is a fact that was expressly denied by Plaintiff in her initial pleading.  *See* Initial Petition ¶89(b) (claiming KU did not issue a no-contact order after being informed of the "on-campus intimidation").  Plaintiff's flip-flopping on these critical facts, specifically in light of her actual notice of the same—as Plaintiff received a copy of the no-contact order via e-mail and her counsel was provided access to her IOA file--demonstrates her continued effort at what can at best be described as "artful pleading."

[11] The full academic calendars for the years of Fall 2013 through Spring 2019 are publicly available at https://registrar.ku.edu/lawrence-academic-calendars-kbor-approved and are matters of which the court may take judicial notice.  *See supra*, note 9.

Plaintiff's Complaint claims that during October, November and December of 2015, her anxiety and panic attacks worsened and would manifest during workouts at the KU football team's stadium.  *Id*. at ¶52.  Plaintiff's Complaint claims she began to withdraw from campus life, avoiding athletic facilities and dining halls where she might encounter John Doe G or other football players. *Id*. at ¶54.

## VI.   **Rowing Training Trip**

In early December in 2015,[12] the Head Coach informed Plaintiff that he would not allow her to attend an annual training trip to Florida later that month.  *Id*. at ¶55.  Plaintiff then told him about her rape, the investigation, what she had been coping with, how much the trip meant to her; she asked him what she needed to prove to be fit enough for the trip, and the Head Coach told her she had to perform a specific time on a 2k-test.  *Id*. at ¶56.  Plaintiff passed the test the next day, but the next week, the KU rowing coaches published the list of who would be going on the training trip, and Plaintiff was still not on the list, although other rowers with less experience and slower times were on the list.  *Id*. at ¶¶57-58.

Plaintiff met with the Head Coach and showed him the team test results, and showed him that she was faster than many of the people who were selected to go on the trip, but the Head Coach would not permit her to go on the trip.  *Id*. at ¶60.  Plaintiff requested a letter that would permit her to transfer to another school if necessary and told him that the rape and stalking in addition to the rowing team issues may force her to leave.  *Id*. at ¶61.  Plaintiff's Complaint alleges that the Head Coach told her that he would give her the letter but not let her transfer to another school in

---

[12] Again, Plaintiff fails to be any more specific when alleging these events in which she allegedly personally participated.

the Big XII.  *Id*. at ¶62.  The Head Coach never permitted her to travel with the team on the trip, even though an extra spot opened on the trip.  *Id*. at ¶68.

After winter break, Plaintiff returned to KU for the next semester in January of 2016, and she alleges she attended "approximately one week" worth of classes.  *Id*. at ¶73.  KU still had not suspended or expelled John Doe G or concluded its investigation into Plaintiff's report.  *Id*. at ¶74. Plaintiff met with the Head Coach, who stated, falsely (Plaintiff alleges), that she was not allowed to go on the trip because of her weight[13] and because she had skipped body weight exercises at the football stadium workouts.  *Id*. at ¶75.  Plaintiff decided she had no choice but to withdraw from KU.  *Id*. at ¶76.  Plaintiff told the Head Coach that she did not want to quit, but that she needed to leave KU until the investigation into her report was completed.  *Id*. at ¶77.  Plaintiff met with IOA and reported her claims about the Head Coach and then returned home to Florida.  *Id*. at ¶78. Absent from Plaintiff's allegation is any complaint that she actually chose to go ahead and pursue an IOA complaint against the Head Coach.

The FAC contains the new allegation, "upon information and belief" that the Head Coach retaliated against Tackett and McClure "because he did not want scrutiny drawn to his history of interactions with his female rowers."  FAC ¶79.  If this is the plaintiff's theory, it defies common sense, as the decision in December came after the meeting with Senior Associate Athletic Director Van Saun in which "many" rowers voiced complaints about the Head Coach.  The FAC contains no allegations that anything negative happened to the rest of the "many" rowers who complained.

---

[13] "Because of her weight" is new in the FAC.  This new allegation is conspicuously absent from the original complaint, when only five months ago the allegation was she was told she could not go only because she had skipped body weight exercises.  As explained below, this new and revised story– about conversations in which Plaintiff had personally participated – adds nothing to this claim of discrimination "because of sex."

The Rules require that, to survive a motion to dismiss, the allegations must be plausible.  This one is not, and it should be disregarded.

## VII.   Events after Plaintiff Withdraws from KU

Back in Florida, in February of 2016, Plaintiff received an email from unspecified "coaches" asking for her to return her equipment, which consisted of spandex sweatpants, t-shirts and sports bras she had used that semester.  Complaint ¶83.  Plaintiff's FAC claims – falsely, and with no basis whatsoever– that this email was sent at the direction of the Head Coach.  Plaintiff also received a letter from someone at KU informing her that it would be billing her for the semester and that the bill would be subject to collections if not paid on time.  *Id*. at ¶84.  KU also placed an administrative hold on her transcripts.  *Id*. at ¶85.[14]

In March of 2016, more than four months after her report, KU informed Ms. Tackett that John Doe G had agreed to be expelled.  *Id*. at ¶90.  Plaintiff filed this lawsuit on March 21, 2016.  *See* Petition, page 1 (Notice of Removal, Doc. 1, Ex. A).

## VIII.   New Allegations of the First Amended Complaint

Faced with a Motion to Dismiss demonstrating that her Petition lacked merit, Plaintiff has made a variety of new allegations in her First Amended Complaint.  Those new allegations appear designed to get headlines, but they have no connection to anything that happened to Plaintiff.  Here are the new allegations not already noted above:

"KU has an official policy that requires female rowers to attend KU football games, and to cheer and encourage the football players as they enter the field."  FAC ¶70.  "Even two rowers like Plaintiff and Sarah McClure, who had been sexually assaulted by a KU football player, were

---

[14]   A copy of the letter sent to Ms. Tackett by IOA's Investigator and a copy of the e-mail transmitting the same is attached as Exhibit 3.

encouraged and expected to attend and root on the KU football players under KU's policy."  FAC ¶71.  Notably, Plaintiff fails to identify where such policy is, because no such policy exists that requires female rowers to attend KU Football games.  KU encourages all students, faculty, staff and fans everywhere to attend KU football games and other athletic events.  Whether they choose to do so is up to them.  This allegation is meaningless, without basis in fact, and irrelevant.

"KU has an official policy and practice of entertaining football recruits in hotels just off campus and encouraging female KU athletes to attend parties with the recruits."  FAC 72.  Again, this allegation is false.  Moreover, even if it were true, nothing about the events alleged in the FAC suggest that Ms. Tackett ever attended such a party or met a recruit, or that any such parties or recruits have anything to do with her sexual assault case.  Rather, this throw-away allegation is clearly intended solely as an attempt to try this case in the press – which increasingly appears to be the plaintiff's prime objective.  The new allegation is baseless and irrelevant to the lawsuit altogether.

Finally, at paragraph 49 of the FAC, plaintiff alleges that, at some unknown time in some unidentified document, the U.S. Department of Education issued guidance "to the KU" [sic] that it should promptly take steps to protect the complainant upon learning of a sexual violence allegation – including a campus ban, a no-contact order, or suspension.  Again, this desperate and typically vague allegation from this plaintiff should be disregarded for purposes of this motion.  But to the extent the plaintiff relies on the U.S. Department of Education's April 2011 "Dear Colleague Letter," ***not even the Department of Education believes these standards apply in private actions for damages like this one.***  As one federal court recently observed – rejecting claims much like this one – a letter from the Department to Senator James Lankford, dated February 17, 2016, noted that " 'OCR issues guidance documents—including interpretative rules,

general statements of policy, and rules of agency organization,' but '[t]he **Department does not view such guidance to have the force and effect of law**.'" *Moore v. Regents of the Univ. of California*, No. 15-CV-05779-RS, 2016 WL 2961984, at *5 (N.D. Cal. May 23, 2016) (explaining why the plaintiff's attempts to base liability on Dear Colleague Letters "simply is misguided") (emphasis added).  Moreover, as the attached exhibits demonstrate, KU did issue a no-contact letter – in addition to effectively expelling the assailant.

## PLAINTIFF'S CLAIMS

Plaintiff's Complaint states two counts.  Count I alleges a hostile educational environment in violation of Title IX.  Count II alleges retaliation in violation of Title IX.  As to the first count, Plaintiff seeks to hold KU responsible for the sexual assault by John Doe G.  She also appears to claim that the Head Coach created a hostile educational environment by making "inappropriate comments" and not allowing her to travel with the team.  She also claims that Joe Doe G tried to intimidate her on campus, for which she also seeks to hold KU responsible.  Plaintiff claims that many of the same actions were also retaliatory, as were efforts by unidentified KU employees to collect tuition and fees and put holds on her account.  The claims have no merit, and they should be dismissed.

## QUESTIONS PRESENTED

1.      Whether KU may be held liable under Title IX for a rape when it had no knowledge of any prior sexual misconduct by the alleged rapist or prior harassment of the plaintiff, and whether KU may be found to have been "deliberately indifferent" to an allegation of sexual assault where it investigated the complaint, provided an escort to the plaintiff, and issued a no-contact order to and expelled the rapist.

2.      Whether the Head Coach's alleged racial comments and comments about student-athletes' weight are covered by Title IX, and if so, whether they amount to severe, pervasive, and objectively offensive conduct sufficient to state a private right of action.

3.      Whether plaintiff engaged in conduct protected by Title IX and has alleged sufficient facts to make a claim of retaliation plausible under the *Iqbal/Twombly* standards.

4.      Whether KU may be held liable under Title IX for retaliation where plaintiff fails to establish that the University was deliberately indifferent to her claims.

## ARGUMENT

Plaintiff's First Amended Complaint fails to state a claim against the University because the University investigated her complaint of discrimination, provided her an escort on campus, issued a no-contact order, and her assailant agreed to be expelled.  Those actions demonstrate the University's commitment to fighting sexual assault on campus.  Plaintiff's burden under Title IX, however, is to show that the University was deliberately indifferent to harassment of which it had actual knowledge.  Plaintiff's Complaint alleges a variety of conclusory and vague events that should be disregarded, but even if the allegations were credited, the Complaint fails to state a plausible claim, and her case should be dismissed.

### A.  Title IX

Title IX provides, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).  Title IX may be enforced through civil damages suits, but civil liability arises "only when the recipient of federal funds has actual notice of the alleged discrimination and responds with deliberate indifference to that discrimination."  *Gebser v. Lago Vista Indep. Sch.*

*Dist.*, 524 U.S. 274, 290-91 (1998) (addressing whether school was deliberately indifferent to teacher-on-student sexual harassment); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999) (adopting same standard for student-on-student sexual harassment).   Actionable discrimination under Title IX includes sexual harassment, but only where that harassment is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.  *Davis,* 526 U.S. at 633; *see also Escue v. N. Okla. Coll.*, 450 F.3d 1146 (10th Cir. 2006) (same).

Thus, while a private right of action exists under Title IX, it requires more than negligence by school officials.  *See Davis*, 526 U.S. at 641.  Rather, when a school does not engage in the harassment directly, "it may not be liable for damages unless its deliberate indifference subjects its students to harassment.  That is, the deliberate indifference must, at a minimum, *cause students to undergo harassment* or make them liable or vulnerable to it."  *Id*. at 644-45.  The Supreme Court has made clear that universities need not expel every student accused of harassment in order to avoid liability under Title IX.  *Id*. at 648.  The Supreme Court has also recognized that universities may make disciplinary decisions that recognize their potential exposure to constitutional or statutory claims by the alleged harasser.  *Id*. at 649.

For Plaintiff to recover damages under Title IX based on the University's response to sexual harassment or sexual violence, she must show three elements:

1)   the University remains deliberately indifferent to acts of sex-based harassment of which it has actual knowledge,

2)  the harassment was reported to an appropriate person … with the authority to take corrective action to end the discrimination, and

3)  the harassment was so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school.

*Escue*, 450 F.3d at 1152 (citations omitted).  Schools cannot be held vicariously liable for acts of sexual harassment or violence committed by teachers or students on campus.  *See id.*  "This limited rule imposes liability only on those school[s] that choose to ignore Title IX's mandate for equal educational opportunities."  *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999).  Administrators need not engage in particular disciplinary action under Title IX; they must simply respond in a manner that is not clearly unreasonable.  *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1123 (10th Cir. 2008) (quotations omitted).

KU has not ignored Title IX, and it did not ignore Plaintiff's complaints.  While Plaintiff appears to have purposefully omitted any dates or details of the investigation process and communications with her about that process,[15] even on the vague and dateless facts included in the Complaint, it does not state a claim for deliberate indifference, and her claims should be dismissed.

**B.  KU Is Not Liable for Student John Doe G's Actions.**

Plaintiff's primary claim is that KU is responsible for her sexual assault.  This claim lacks merit, and it should be dismissed.  For Title IX liability to attach, the University must have actual notice of ongoing discrimination and remain deliberately indifferent to it.   Plaintiff's non-conclusory allegations show neither.

1.   KU Did Not Have Actual Notice of Ongoing Sexual Harassment

As to John Doe G, Plaintiff alleges that they were both at a gathering of KU students and athletes at the Towers when he invited her back to his room to watch TV and she accepted.   Once in his room, he sexually assaulted her.  *See* Complaint ¶¶18-20.  Plaintiff's Complaint alleges no

---

[15]   *Compare to Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012) (affirming dismissal of retaliation claim in employment case where plaintiff failed to allege critical facts and dates she would be expected to know).

prior interactions with John Doe G, no prior sexual assaults by him, no prior harassment by him, and no prior actions by him of any kind.  The Complaint includes no facts suggesting that KU had any knowledge that John Doe G was engaging in any harassment of her whatsoever or was a threat to her.  There is no allegation that Plaintiff was at the Towers for any kind of University event or program.  Rather, the Complaint alleges a single tragic incident of sexual assault.  The Supreme Court has strongly suggested that a single incident of peer-on-peer harassment is not sufficient to establish liability under Title IX.  "Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment."  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 652-53 (1999).

In this case, the sexual assault against Plaintiff occurred once, long before she reported it to KU.  In such cases, the Fifth Circuit has found that the school cannot be liable:

> Under the standard we announce today, the school district can be liable, if at all, only for the damages caused by its intentional acts of discrimination.  ***If the conduct has ceased by the time a supervisory employee of the sort we describe here learns of it, there is no liability in a private suit for that conduct based on some personal failure to take 'proper remedial action' thereafter.***

*Rosa H. v. San Elizario Independent School Dist.*, 106 F.3d 648, 661 (5th Cir.1997) (emphasis added); *see also Blue v. D.C.*, 850 F. Supp. 2d 16, 32 (D.D.C. 2012), *aff'd*, 811 F.3d 14 (D.C. Cir. 2015) (dismissing Title IX claim where improper relationship ended before appropriate school official had notice of it).  Here, the single incident of sexual assault by John Doe G happened more than a year before Plaintiff made KU aware of it.  Plaintiff's Complaint does not allege actual knowledge of John Doe G's actions such that the University can be found to have had actual

knowledge of ongoing harassment, and her claims for damages based on her sexual assault should be dismissed.

2.   Generalized Knowledge Of Past Harassment Is Not Enough For Title IX Liability

While Plaintiff will undoubtedly argue that the "specific history" of sexual assaults in the Towers put the University on notice of the risk of sexual assault, this theory fails to state a claim and has been repeatedly rejected – just as the Supreme Court in *Davis* suggested it should be rejected due to "the inevitability of student misconduct." *Davis*, 526 U.S. at 652.

"Generalized knowledge of past harassment is not sufficient to impose liability under Title IX." *Doe v. Bibb Cty. Sch. Dist.*, 83 F. Supp. 3d 1300, 1305 (M.D. Ga. 2015) (collecting cases), *reconsideration denied*, No. 5:12-CV-468 MTT, 2015 WL 778343 (M.D. Ga. Feb. 24, 2015); *Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1081 (D.N.M. 2010) ("Because the Defendants did not have actual knowledge of any sexual assault of (the victim) before it occurred, the Court finds that the Defendants cannot be liable … under Title IX").

One case recently rejected exactly this theory, even where the plaintiff alleged five prior sexual assaults in campus dorms, because there was no allegation that the victim's attacker had been involved in any of prior assaults.  *Facchetti v. Bridgewater Coll.*, No. 5:15-CV-00049, 2016 WL 1259415, at *8 (W.D. Va. Mar. 30, 2016) ("The fact that there were five other sexual assaults in campus dorms in the preceding year is simply too tenuous to satisfy the 'actual notice' requirement under clear Fourth Circuit precedent.").  The Tenth Circuit has the same actual notice requirement, and the facts in the Complaint do not satisfy that requirement.  *Schaefer*, 716 F. Supp. 2d at 1081 ("Neither the Supreme Court nor the Tenth Circuit have said that a school district would be liable if it was aware that sexual harassment could, might, or would likely occur in the future."); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999 (1998)

(requiring "actual knowledge of discrimination" and deliberate indifference for Title IX liability). Plaintiff's Complaint does not allege that at the time of her assault in 2014, the University was aware that John Doe G had previously harassed or assaulted her or anyone else. Thus, Plaintiff cannot satisfy the first element of the cause of action – actual knowledge by the University.

Even if the claim had theoretical merit (which the University denies), this theory is not factually supported. While citing alleged sexual assaults that were reported in residence halls on KU's campus, only two of those are alleged to have occurred in the Towers prior to her sexual assault, and only one of those involved a football player. *See* Complaint ¶11(a) and (e). Thus, the allegation that KU had a policy of putting football players in the Towers does not advance her theory. One sexual assault by one football player cannot be sufficient for the University or the court to assume that all football players are a threat. If so, the University could be held liable simply for providing a co-educational institution of higher learning, which the Tenth Circuit has rejected.[16] The others that allegedly occurred at the Towers occurred after Plaintiff's assault. Events occurring after Plaintiff's assault cannot be held to have provided notice of any threat to the Plaintiff.

Importantly, Plaintiff's Complaint makes no allegation about what the University did in response to the prior reports of sexual assault. Plaintiff's Complaint does not allege that John Doe G committed any of these prior assaults or that the University was aware that John Doe G had committed them and did nothing about it. Just as importantly, nowhere does Plaintiff claim that the University could have prevented the unfortunate events that happened when John Doe G and

---

[16] "To be sure, in those cases the school district could anticipate that the very operation of a school would be accompanied by sexual harassment, but that is simply because, unfortunately, some flawed humans will engage in such misconduct when they are in the company of others." *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007).

Plaintiff went to his apartment.  These facts – and lack of facts – do not plausibly state a claim against KU for Plaintiff's sexual assault.

3. <u>KU Investigated, Provided Plaintiff an Escort, Issued a No-Contact Order, and John Doe G Agreed to be Expelled.</u>

To be liable under Title IX, plaintiff must plead and prove facts showing that the University was deliberately indifferent to her complaint of discrimination.  "Deliberate indifference" is an "exacting standard," *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013) (internal quotation marks omitted).  To prove it, plaintiff must show a response that was more deficient than merely "negligent, lazy, or careless," *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006); *Karasek v. Regents of the Univ. of California*, No. 15-CV-03717-WHO, 2016 WL 4036104, at *11 (N.D. Cal. July 28, 2016).[17]

KU was not deliberately indifferent when Plaintiff reported her assault one year later.  KU investigated her claim, provided her an escort to classes, and issued a no-contact order, and John Doe G agreed to be expelled.  While Plaintiff complains that this process took four months, she ignores the Thanksgiving and long winter break when students are away from campus and the constitutional requirement that all students, including John Doe G, receive certain due process protections.  She does not allege that any severe, pervasive, and objectively unreasonable harassment by John Doe G occurred in the meantime.  The only thing she claims John Doe G did was "stare her down" twice on campus and call her a derogatory name once.  In response, KU provided an escort and issued a no-contact order, and Plaintiff's Complaint does not allege any

---

[17]  In a case similar to this one, the court in *Karasak* found no deliberate indifference and granted the University's motion to dismiss where the University began investigating her assault within one month of when she reported it, found that the assailant had violated the Student Code and imposed disciplinary measures against him within a six-month period.  2016 WL 4036104, at *13 (N.D. Cal. July 28, 2016).

further contact with or alleged harassment by John Doe G.  Two brief visual encounters and one insult are not "severe, pervasive, and objectively offensive," and the University's response demonstrates it was not deliberately indifferent.  *See C.R.K. v. U.S.D. 260*, 176 F. Supp. 2d 1145, 1165 (D. Kan. 2001) (providing plaintiff an escort to classes "does not evince deliberate indifference to harassment"); *Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1082 (D.N.M. 2010) (where school took action after four incidents, it was not deliberately indifferent).

Plaintiff's Complaint also alleges that John Doe G was not banned from campus, given an *immediate* no contact order, or immediately suspended once the University received a report of sexual assault.  These facts are not evidence of deliberate indifference.  Rather, they show a respect for due process.  "Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning." *Doe v. Brandeis Univ.*, No. CV 15-11557-FDS, 2016 WL 1274533, at *6 (D. Mass. Mar. 31, 2016) (denying, in part, university's motion to dismiss claims brought by student accused of sexual misconduct).  And Plaintiff ignores the Supreme Court's clear statements that, in this context, she does not have the right "to make particular remedial demands" and that it is "entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims." *Davis*, 526 U.S. at 648-49.  Moreover, the Complaint is devoid of any factual allegation that in 2015, at the time she reported the sexual assault from 2014, there was any ongoing harassment of her by John Doe G that might warrant an immediate suspension or ban from campus, and when she reported unwelcome contact with him after her complaint, a no-contact order was issued.

All KU students facing expulsion, such as John Doe G faced, are provided certain due process protections under University rules and the United States Constitution.[18]  As an institution of higher learning, KU must balance its ongoing commitment to support sexual assault victims and to take action against reported sexual harassment with the due process rights afforded to all students.  Failure to respect those rights increasingly leads to litigation by the accused student.  *See, e.g., Yeasin v. University of Kansas*, 51 Kan. App. 2d 939, 951 (2015) (alleging due process and free speech violations where University expelled male student for violations of sexual harassment policy and no-contact order, and requiring readmission of expelled student).[19]

---

[18]  *See Brown v. Univ. of Kansas*, 16 F. Supp. 3d 1275, 1288 n.38 (D. Kan. 2014) (collecting cases), *aff'd*, 599 F. App'x 833 (10th Cir. 2015).  *See also Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729 (1975) (addressing disciplinary process in a public high school and noting that "the timing and context of the notice and the nature of the hearing (requirements) will depend on appropriate accommodation of the competing interests involved").

[19]  Similar cases challenging such expulsions have been filed across the country.  For example, a student charged with sexual harassment at Oklahoma City University successfully sought and obtained a federal court injunction stopping his expulsion.  *Ritter v. State of Oklahoma*, No. CIV-16-0438-HE, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016).  The court's reasoning is instructive here, because the court held that it was "critical that the accused have a reasonable opportunity to present his version of the events, particularly as to those adverse 'findings' which were the apparent basis for the substantial penalty meted out here."  Similarly, in *Doe v. Brandeis University*, the court found that the accused student adequately alleged a violation of "basic fairness" when the school took "punitive action" against the accused without giving him "an opportunity to explain his side of the story" – including banning him from his residence, classes, and campus positions and sequestering him in a campus facility while having no information suggesting he was a danger to the complainant or the school community.  ___ F. Supp. 3d ___, No. CV 15-11557-FDS, 2016 WL 1274533, at *8, *32 (D. Mass. Mar. 31, 2016).  *See also Marshall v. Indiana Univ.*, ___ F. Supp. 3d ___, 2016 WL 1028362, at *3 (S.D. Ind. Mar. 15, 2016) (male student asserting due process and Title IX claims arising from expulsion after alleged sexual assault); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 716 (E.D. Va. 2015) (denying motion to dismiss student's due process claim); *Doe v. Colgate Univ.*, 2016 WL 1448829, at *1 (N.D.N.Y. Apr. 12, 2016) (challenging University's investigation of alleged sexual assaults); *Doe v. Univ. of Cincinnati*, No. 1:15-CV-681, 2016 WL 1161935, at *1 (S.D. Ohio Mar. 23, 2016) (accused male students claiming Title IX and due process violations); *Doe v. Brown Univ.*, No. CV 15-144 S, 2016 WL 715794, at *1 (D.R.I. Feb. 22, 2016) (discussing the "wave of litigation" in student sexual assault matters, and collecting cases).

Accordingly, it would have been improper – and subjected the University to the substantial risk of a lawsuit by John Doe G[20] – for the University to ban him from campus or suspend him before fully investigating the complaints and allowing John Doe G to be heard through the University's disciplinary procedures.  Nonetheless, Plaintiff's Complaint establishes that while affording due process, KU was able to investigate and fully resolve the complaint against John Doe G – for actions that occurred more than a year before – in four months.  As a result, John Doe G agreed to be expelled.  While the investigation was pending, KU provided an escort to the Plaintiff and issued a no-contact order, and Plaintiff does not allege any contact with John Doe G thereafter.  The University's actions cannot be considered deliberately indifferent to ongoing harassment by John Doe G, and Plaintiff's claims related to his actions should be dismissed.

### C.  <u>KU is Not Liable for "Inappropriate Comments" by the Head Coach</u>

Plaintiff also seeks to hold KU liable for a hostile educational environment for alleged "inappropriate comments" by the Head Coach.  Those comments, according to the Complaint, were "racial remarks about some rowers" and "numerous comments about the weight of the female athletes, calling some of them fat."  Complaint ¶26.  Racial harassment, however, is not prohibited by Title IX, and calling a Division I athlete "fat" is not indicative of any sexually discriminatory motive and therefore is also not covered by Title IX.  Moreover, the alleged remarks do not rise to the level of "severe, pervasive, and objectively offensive" as required for liability, and the Complaint demonstrates that the University was not deliberately indifferent to the athletes' complaints.  Therefore, this claim should be dismissed.

---

[20]  Indeed, as evidence at the summary judgment stage would show, and as Plaintiff is aware, prior to agreeing to be effectively expelled, John Doe G threatened the University with litigation in this case.

First, as the statute clearly indicates, Title IX protects against discrimination on the basis of sex, not race.  *See* 20 U.S.C. § 1681(a) (prohibiting discrimination "on the basis of sex").  The Head Coach's unspecified "racial comments" (which he denies) are therefore not prohibited by Title IX, and Plaintiff's claim based on those alleged comments fails as a matter of law.

Second, comments about weight to Division I athletes on a women's rowing team cannot be reasonably interpreted as either sexual in nature or gender motivated.  They therefore are also not covered by Title IX.  *See Seamons v. Snow*, 84 F.3d 1226, 1233 (10th Cir. 1996) (coach's comments to football player that "boys will be boys" and other hazing did not show sex discrimination); *Terry v. Young Harris Coll.*, 106 F. Supp. 3d 1280, 1299 (N.D. Ga. 2015) (complaint about hazing was not a complaint of sexual harassment and therefore not protected conduct in Title IX retaliation case).  Title IX protects against discrimination "on the basis of sex."  Here, we are talking about student-athletes on a Division I women's rowing team – so all of the players were female, and the Complaint alleges that only "some" of the athletes were subject to such comments.  Complaint ¶26.  Nothing about the alleged comments was sexual or sex-based.  Athletes are generally expected to be in shape, and in the sport of competitive rowing, weight matters.  The heavier a rower is, the more drag there is on a boat.  *See* Wikipedia on Rowing, Fitness and Health ("extra weight does increase the drag on the boat"), https://en.wikipedia.org/wiki/Rowing_(sport) (last visited May 27, 2016).[21]  Thus, even if this

---

[21]  *See also* Concept2.Com, Indoor Rowers, Weight Adjustment Calculator:
> The Concept2 Indoor Rower is a very useful tool for rowing coaches, because it provides a controlled, measurable way to compare their athlete's potential. ***However, it is important that coaches take into account the body weight of their rowers as well.***
http://www.concept2.com/indoor-rowers/training/calculators/weight-adjustment-calculator (emphasis added) (last visited May 27, 2016).

{L0054036.5 }

25

Division I coach did call some of the student-athletes "fat" (which he denies), it does not constitute discrimination "on the basis of sex."

Third, because these comments were not sexual in nature or otherwise discriminatory in any way, the complaints about them fail to establish "actual notice" to the University of ongoing sexual harassment Plaintiff must show under *Davis*. *See DeCecco v. Univ. of S. Carolina*, 918 F. Supp. 2d 471, 492 (D.S.C. 2013) (granting summary judgment in case involving coach's comments to women's soccer players, where, "At worst, this evidence suggests (the coach) used foul language, made unspecified inappropriate comments, had an unspecified objectionable way of talking to women, and made comments to one player about her hair, makeup or clothing.").

Fourth, under the pleading standards of *Twombly* and *Iqbal*, even if such comments were assumed to be "on the basis of sex," the Complaint does not provide any information about their frequency, severity, or pervasiveness, relying solely on conclusory allegations.  Plaintiff only describes them as "numerous," in her original petition, which she now has amended to "relentless" and "ongoing."  Like "numerous," these terms are so vague as to be meaningless, and Plaintiff's obligation is to allege sufficient facts that her claim is plausible.  Allegations such as those within Plaintiff's Complaint are "too conclusory, vague and confusing to give each 'defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Burnett v. Mortgage Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013) (citing *Twombly*, 550 U.S. at 555). Plaintiff's Complaint fails to meet that standard.

Finally, the Complaint makes clear that the University was not "deliberately indifferent" to complaints the student-athletes made about these comments.  The members of the KU women's rowing team went to the sports psychologist to complain about the alleged comments (Complaint ¶28), and the next week the coaches and Van Saun met with the students to hear their complaints.

(Complaint ¶30.)   Members of the rowing team then repeated the things they had told the psychologist.  *Id.* at ¶31.  Apparently the meeting had an effect, because Plaintiff does not allege that such conduct occurred again.  *See Davis*, 526 U.S. at 644–45 (requiring that, for deliberate indifference to give rise to a Title IX claim, it must "cause [plaintiff] to undergo" harassment or "make [her] liable or vulnerable" to it); *Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1082 (D.N.M. 2010) (where school took action after four incidents, it was not deliberately indifferent).  Thus, the Complaint makes clear that the University was not deliberately indifferent to statements allegedly made by the coach, and such claims should be dismissed.

**D.  The University is Not Liable for the Head Coach Not Taking Plaintiff on a Training Trip**

Plaintiff also seeks to hold the University responsible under Title IX for the Head Coach's decision not to take her on a Florida training trip, a decision he told her about on December 3, 2015.  She appears to assert this as a retaliation claim.

To allege a prima facie case of retaliation under Title IX, plaintiff must allege (1) that she engaged in protected activity under Title IX; (2) that she suffered adverse action contemporaneous with or subsequent to such activity; (3) a causal nexus between the protected activity and the adverse action; and (4) the University had actual knowledge of the retaliation and remained deliberately indifferent to it.  *See Rubio v. Turner Unified Sch. Dist. No. 202*, 523 F. Supp. 2d 1242, 1253 (D. Kan. 2007); *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173-74, 125 S. Ct. 1497 (2005) (holding that retaliation because a person has complained of sex discrimination is a form of "discrimination" encompassed by Title IX's private cause of action and is actionable despite the lack of any separate retaliation provision in the statute).  Under the third element, Plaintiff must plead facts that could establish a causal connection between her protected activity and the University's adverse action.  *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir.

2007). To establish the requisite causal connection, Plaintiff must allege facts to demonstrate either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014) (citing *Cooper v. Menges*, 541 Fed. App'x. 228, 232 (3d Cir. 2013) (citations omitted).

Here, the Complaint has not alleged either protected activity or a causal nexus between protected activity and the adverse action. To the extent Plaintiff relies on complaints about the Head Coach's alleged "racial comments" and the rowers' weight, that activity is not protected under Title IX because it does not complain about sex discrimination. Moreover, there are no allegations that any of the other "many [female] members of the rowing team" who also spoke at the meeting with were prohibited from going on the trip to Florida.

To the extent Plaintiff claims her complaints about sexual assault were the protected activity, she has now amended her Complaint to allege that she should be able to assume that Coach Catloth knew because she had told teammates and a female assistant coach.[22]  This amendment is problematic for a number of reasons. First, it is based upon her own self-serving speculation that someone told Coach Catloth about her sexual assault, disregarding the more reasonable inference that the individuals to whom she reported this would instead not violate Plaintiff's confidence and not share this very personal issue with Coach Catloth, someone who was not involved in the IOA's investigation and did not need to know. Second, paragraph 43 is inconsistent with the timeline set forth in the other allegations:  Plaintiff alleges that she first

---

[22]     Complaint at ¶ 43 ("Upon information and belief, Coach Catloth learned in October 2015, <u>or earlier</u> that Daisy Tackett had been sexually assaulted, having learned of the account from other rowers and coaches on the team.") (Emphasis added).

reported her sexual assault to the University after learning of McClure's report and that McClure's report occurred "later in October of 2015." *Id.* at ¶¶ 36-37. Plaintiff cannot conceivably claim that Coach Catloth learned in "October of 2015 *or earlier*" of her report of her sexual assault to IOA when she had yet to report it. Finally, Plaintiff's Complaint makes it clear that her actual knowledge of when the Head Coach learns of her sexual assault is *after* he told her she would not be making the Florida trip with the team. Complaint ¶¶55-56. There cannot be a causal nexus between when she was first told she could not go on the team and her sexual assault when his actual notice of the sexual assault occurred after. Moreover, as Plaintiff acknowledges, in December 2015, prior to the training trip, she requested to transfer to another school. After giving notice that she was no longer interested in being on the team, Plaintiff cannot claim that her subsequent failure to be selected when a spot on the training trip opened up is somehow retaliatory.[23] While the Court reviews the allegations in a light most favorable to Plaintiff, she must "nudge [her] claims across the line from conceivable to plausible" in order to survive a motion to dismiss. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012). It defies logic as to how these newly added allegations are "plausible" when viewed in light of her Complaint as a whole.

Plaintiff alleges that "upon information and belief she and Sarah McClure were retaliated against because [Coach Catloth] did not want scrutiny drawn to his history of interactions with his female rowers." FAC ¶ 79. This assumption is not a plausible conclusion based upon the facts alleged. Plaintiff's Complaint is devoid of allegations that Ms. McClure ever participated in any

---

[23] Where intervening events between protected conduct and the challenged adverse action provide a legitimate basis for the action, even a short period of time between the two will not give rise to an inference of retaliation. *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001–02 (10th Cir. 2011).

team meeting or ever made any complaint about Coach Catloth.  There is no allegation that Coach

Catloth or any of the coaching staff were aware of Ms. McClure's complaint to IOA about John

Doe G.  Therefore, Plaintiff's purported explanation for the alleged retaliation is not plausible.

It is also not plausible to infer that Plaintiff's and Ms. McClure's ultimate non-selection

for the rowing trip, particularly in light of Plaintiff's earlier request to transfer to another school,

was retaliatory.  While Plaintiff's Complaint fails to allege how Ms. McClure participated in the

same protected conduct with regards to the rowing coach, Plaintiff's Complaint alleges that

"many" other rowers allegedly complained about the Head Coach and yet does not identify any

other of those "many" student athletes, other than herself, who were not allowed to go on the trip.

Moreover, Plaintiff's Complaint also does not establish the fourth element of such a claim

– that an appropriate person at the University had actual notice and remained deliberately

indifferent to it.  Plaintiff does not allege that she chose to go forward with a complaint against the

Head Coach.  Nor do the allegations made by Plaintiff suggest that KU's office of IOA remained

indifferent to her allegations.  KU's interim IOA director Joshua Jones responded to the concerns

of Plaintiff's father confirming awareness of Plaintiff's initial placement on the standby list for the

trip.  Mr. Jones' response confirms that IOA had communicated with Athletics and confirmed that

such decision was made without consideration of Plaintiff's IOA complaint.  FAC at ¶¶ 64-65.

While the result may not have been Plaintiff and her father wanted, it does not rise to the level of

deliberately indifferent.

### Plaintiff Fails to State a Claim of Retaliation for Post-Withdrawal Actions

Plaintiff's Complaint alleges retaliation by the University for (1) John Doe G's "intimidation

and witness tampering"; (2) denial of access to rowing team activities; (3) acts to collect bills and

equipment; (4) refusal to permit rowing at other schools and (5) holds placed on her records.

Complaint ¶109.  Plaintiff's allegations about the actions of John Doe G and the Head Coach and KU's actions in response are fully discussed above; they do not state retaliation claims for the same reasons they do not state Title IX claims.

As to the remaining allegations, on a Rule 12 motion, conclusory allegations of retaliation are not sufficient, and the Tenth Circuit has affirmed dismissal where the plaintiff fails to provide context for when a plaintiff complained, or to whom; fails to include allegations of similarly situated individuals who were treated differently; fails to include facts relating to the alleged discrimination; and fails to allege a nexus between the person(s) to whom she complained and the person who took the adverse action.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012) (affirming dismissal of retaliation claim in employment case).  Plaintiff's Complaint suffers the same failings and should likewise be dismissed.

1.   Collection Activity, Return of Equipment, and Holds

The Complaint alleges that Plaintiff engaged in allegedly protected conduct in October 2015.  Complaint at ¶¶28-31.  It alleges she received an email from unspecified "coaches" in February 2016 seeking return of equipment and received a letter from KU billing her for the semester and placing a hold on her accounts.  *Id*. at ¶83.  Plaintiff's Complaint fails to allege sufficient facts to plausibly suggest these actions were retaliatory, particularly where the alleged retaliatory events happened after she withdrew from KU.

First, they happened four months after plaintiff's allegedly protected activity.  The Tenth Circuit has recognized that a three-month period between protected activity and the adverse action, standing alone, is not sufficient to show causation.  *Meiners v. University of Kansas,* 359 F.3d 1222, 1231 (10th Cir. 2004); *Hanson v. Colorado Judicial Dep't*, 564 F. App'x 916, 920 (10th Cir. 2014) ("This four-month period is too protracted to permit an inference of retaliation, without

more."). Events occurring four months after protected conduct are insufficient to state a claim for retaliation.

Even if they were, Plaintiff's Complaint fails to provide any of the details necessary to permit a plausible inference of retaliation. For example, despite receiving the letter, the Complaint fails to identify the "coaches" who demanded the return of her equipment such that she could conclude they were even aware of her protected activity. Plaintiff should know who that coach is, but she fails to allege it. The Complaint also fails to identify who sent the collection and hold notices and whether they were aware that she had engaged in protected activity. She should know who sent that hold notice, but she fails to allege it. With 28,000 students, 2,600 faculty, and thousands of other employees, KU is a big place, and it is neither plausible nor alleged that coaches are responsible for assessing or collecting tuition. When suing such an entity, the burden of pleading is on the plaintiff to make clear who is alleged to have done what to her – especially where she would be expected to have those details and simply (or intentionally) omits them. In cases where the plaintiff should know those types of details yet fails to include them, her claims should be dismissed. *See Khalik*, 671 F.3d at 1194 ("plaintiff must include some further detail for a claim to be plausible"); *Burnett v. Mortgage Elec. Registration Sys.*, *Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013) ("Where the plaintiff is the one who ostensibly received these communications and is well-positioned to know, for example, the dates they were received and who sent them, the failure to include any such detail is fatal to the complaint.").

Plaintiff's allegations also provide an independent, non-retaliatory reason for these actions that undercuts any plausible inference of retaliation. Where intervening events between protected conduct and the challenged adverse action provide a legitimate basis for the action, even a short period of time between the two will not give rise to an inference of retaliation. *See Twigg v.*

*Hawker Beechcraft Corp.*, 659 F.3d 987, 1001–02 (10th Cir. 2011). A temporal nexus cuts against an inference of discrimination where the acts respond to other specific events. *See Dewitt v. Sw. Bell Tel. Co.*, 41 F. Supp. 3d 1012, 1023 (D. Kan. 2014). Here there is precisely such an event: Plaintiff's decision to leave the University after starting classes in January. Complaint ¶ 73.

That intervening event explains these three allegedly retaliatory actions by the University, and Plaintiff's Complaint fails to include any facts that could overcome the intervention. Nowhere does the Complaint allege that she had paid her tuition and did not owe anything for having attended a week of classes. Nowhere does the Complaint explain whether the usual policy of the University is or is not to expect student-athletes to return their equipment when they leave the team mid-season. Nowhere does the Complaint allege that others who left KU after a week of classes and did not complain of discrimination had their tuition waived and were allowed to keep their University-supplied equipment. Instead, alleging no context at all, the Complaint simply lists some things that in fact are standard practice when KU students leave school after a week of classes.

Indeed, far from unlawful retaliation, federal law *requires* schools to undertake collection action where students have received financial aid and then withdrawn. *See, e.g.,* 34 C.F.R. § 668.22(h) ("After the institution has allocated the unearned funds for which it is responsible in accordance with paragraph (g) of this section, *the student must return assistance for which the student is responsible*"); 35 C.F.R. § 668.22(h)(4)(ii) ("Within 30 days of the date of the institution's determination that the student withdrew, *an institution must send a notice to any student who owes a title IV, HEA grant overpayment as a result of the student's withdrawal* from the institution.") (emphases added).

Nothing about these actions is sinister or permits an inference of retaliation.  Plaintiff withdrew from school.  That withdrawal has natural consequences, particularly financial consequences and access to university-supplied equipment.  The fact that these actions also happened to occur after she complained about a sexual assault by another student does not permit an inference of retaliation by the University – especially where, as here, the University investigated her complaint, provided her an escort for on-campus security, and issued a no-contact order, and her assailant agreed to be expelled.

Finally, the Complaint fails to allege that she gave the University notice of these actions, and she not surprisingly fails to allege how and whether the University responded to her complaints about these issues.  To state a retaliation claim, however, a plaintiff must allege that the University knew of the retaliation and remained deliberately indifferent to it.  Absent such allegations, Plaintiff's claim should be dismissed.

2.  Transfer Letter

Plaintiff's Complaint about the alleged failure to provide a transfer letter also lacks merit.  First, again, Plaintiff's Complaint fails to allege that she gave anyone of authority at KU notice of this specific allegation of retaliation, and she fails to allege anything about the University's response to that complaint.[24]  Actual notice of the retaliatory action and a deliberately indifferent act are necessary facts of a plausible claim; Plaintiff's Complaint fails to include them, and the claim should be dismissed on this basis alone.

Moreover, the facts alleged fail to show any plausible retaliatory intent.  Plaintiff's Complaint concedes that the Coach agreed to give her a transfer letter, he simply would not give

---

[24]  While the Head Coach was undoubtedly aware of his actions, the Supreme Court has made clear that misconduct by the school employee is not "treated as the grant recipient's actions." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642, 119 S. Ct. 1661, 1671

her a transfer to another Big 12 school.  Complaint ¶62.  There are not facts suggesting retaliatory motivation to such a decision, and it is entirely plausible that the coach simply did not want to arm his primary competition with a rower he spent three semesters training, or that the Conference had restrictions on intra-Conference transfers.  Where the actions alleged include such innocent conduct, the Complaint fails to allege a plausible claim, and dismissal is appropriate.  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

While the Complaint claims that she participated in a meeting complaining about the Head Coach, it provides no information about what happened to any of the other rowers who spoke up at that meeting.  Did they go on the training trip?  Were they allowed to transfer?  Did they suffer any type of alleged harassment or retaliation?  These questions go unanswered in Plaintiff's Complaint, and the void undercuts the allegation of retaliation by the Head Coach.  Moreover, Plaintiff's Complaint nowhere alleges or can logically explain why the Head Coach would have any incentive or reason whatsoever to retaliate against Plaintiff for having complained about the assault by John Doe G.  The Head Coach had no responsibility for the assailant and no responsibility for undertaking an investigation of the complaint.  Far from deliberately indifferent or retaliatory, once KU employees learned of the issue, she was immediately referred to the KU's office of IOA.  IOA was responsible for that investigation – and it did its job.  It investigated, provided an escort to Plaintiff, issued a no-contact order, and concluded the assailant had committed the sexual assault.  As a result, he agreed to be expelled.

Title IX only allows school liability where the school was deliberately indifferent – where it knew of ongoing harassment and retaliation and did nothing about it.  KU's investigation may

(1999).  The University is not automatically liable for the coach's alleged conduct – or held to have notice simply because he knows of his own actions.  *See Gebser,* 524 U.S. at 291; *Pegues v. Baker Univ.*, No. CIV.A. 11-2136-KHV, 2011 WL 4436613, at *4 (D. Kan. Sept. 23, 2011).

not have gone exactly as Plaintiff wished, and the outcome may not have been immediate, but neither perfection nor negligence are the standards for liability under Title IX.  Even on the selective facts included in Plaintiff's Complaint, it does not meet the deliberate indifference standard. Accordingly, her Complaint should be dismissed.

## **CONCLUSION**

Title IX liability requires showing that a school is actually aware of ongoing sexual harassment and remains deliberately indifferent to it.  Here, plaintiff suffered one tragic event of sexual violence – at the hands of someone with no known prior complaints of harassment or assault, of Plaintiff or anyone else.  Plaintiff's Complaint acknowledges that after she brought her complaint, KU investigated, provided her an escort pending the outcome of that investigation, and issued a no-contact order, and her assailant agreed to be expelled.  Those are not the actions of a university that is deliberately indifferent to acts of sexual violence.  They are the actions of a university diligently working to provide a college education free of unlawful harassment and discrimination while balancing the due process rights of the accused student.  This is an appropriate case for the Court to conclude that, as a matter of law, the University's response was not clearly unreasonable, and Plaintiff's Complaint should be dismissed.

Respectfully submitted,

/s/ Megan K. Walawender
Michael C. Leitch, Kansas Sup. Ct. #19588
Megan K. Walawender, Kansas Sup. Ct. #22955
Associate General Counsel and
    Special Assistant Attorney General
Room 245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, Kansas  66045
Tel:  (785) 864-3276;   Fax:  (785) 864-4617
Email:  mleitch@ku.edu
               Megan.walawender@ku.edu

*Attorneys for Defendant*

Date:   September 2, 2016


CERTIFICATE OF SERVICE


        I certify that on September 2, 2016, I electronically submitted this document with the Clerk of the Court using the CM/ECF system, with notice of filing generated automatically and emailed to:

Dan Curry
Sarah Brown
BROWN & CURRY, LLC
406 W. 34th Street, Suite 810
Kansas City, MO 64111
dan@brownandcurry.com
sarah@brownandcurry.com
*Attorneys for Plaintiff*


                                /s/ Megan K. Walawender
                                *Attorney for Defendant*
                                *University of Kansas*