IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DAISY TACKETT,            )
                             )
       Plaintiff,      )
                             )
v.                           )     **Case No. 16-cv-2266-JTM-GEB**
                             )
THE UNIVERSITY OF KANSAS,   )
                             )
       Defendant.    )

## PROPOSED SECOND AMENDED COMPLAINT

1.    Plaintiff Daisy Tackett brings this suit to seek compensation and redress for harms she suffered as a result of a hostile educational environment created by the Defendant University of Kansas in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

2.    This court has jurisdiction over Plaintiff's Title IX claims. A Kansas District Court is a court of general jurisdiction. *Undrey Engine & Pump Co. V. Eufaula Enterprises ,Inc.*, 22 6 Kan. 186, 190, 597 P.2d 246 (1979). State courts have "inherent authority, and are thus presumptively competent, to adjudicate claim arising under the laws of the United States." *Yellow Freight Systems, Inc. v. Donnelly*, 494 U.S. 820, 823 (1990)

3.    Plaintiff Tackett is a female student and athlete who at all relevant times was a student, resident and athlete at the University of Kansas. In January of 2016 she was forced to withdraw from KU and moved back home to Florida.

4.     At all material times, the University of Kansas ("KU") was a Kansas educational institution located in Douglas County, Kansas, and the recipient of federal grant funds.

5.     John Doe G is and was at all times relevant a KU student, a resident of the KU dormitory known as the Jayhawk Towers, and a KU football team member.

6.     Title IX, 20 U.S.C. § 1681(a) states:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance.

7.     A school that receives federal funds violates Title IX and is subject to a private action for damages where the school is "deliberately indifferent" to known acts of discrimination against students. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988).

8.     The protections of Title IX extend to situations where the school is deliberately indifferent to the sexual harassment of a student by another student. *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).

9.     KU is responsible for enforcing these policies and ensuring that is employees are adequately trained to follow these policies.

10.     KU's employees were operating within the scope of their employment at all time relevant with regard to the events described herein.

11.     KU owns and manages student dormitories, including apartments commonly known as the Jayhawker Towers, which has a specific history of

publically reported sexual assaults of women, including but not limited to such recent events as:

a. In March of 2013, the KU public safety office investigated a report of a sexual assault of a female at Jayhawker Towers Apartments.

b. In October 2013, KU received a report of a rape a female KU residence hall resident by a KU student.

c. In April of 2014, a KU female residence hall student reported a rape at her residence hall.

d. In October of 2014, two female KU residence hall students reported sexual assaults at their residence hall by a KU student and another man.

e. In March of 2014, a KU football player was arrested after a 19-year-old KU student reported that she had been fondled while passed out in the parking lot of the Jayhawker Towers, where the football player was a resident.

f. On November 10, 2014, the KU public safety office received a report of an alleged sexual battery at the Jayhawker Towers.

g. In August, 2015, John Doe G sexually assaulted a second female KU rower at the Jayhawker Towers.

h. In February of 2016, a KU football player was arrested held on suspicion of sexual battery and criminal restraint stemming from conduct at the Jayhawker Towers.

12.    In October of 2014, the co-chairwoman of KU's October 2014 taskforce on sexual assaults stated publically that the true number of sexual assaults taking

place on KU's campus is much higher than the reported assaults: "If you look statistically across the nation on average for each assault reported, eight go unreported."

13. KU's taskforce on sexual assaults on campus prompted the university to tout several changes the campus would make to how it handled sexual assault reports; however after announcing such changes, KU did not actually implement many of the changes.

14. KU's police chief for 38 years said in January of 2016 that in recent years a sharp increase of reported sexual assaults at KU has occurred, and that sexual assaults remained the biggest issue for the campus.

15. According to the 2015 Clery Report for KU, in 2014 there were 14 rapes and 10 fondlings reported on campus, with 10 of the rapes and six of the fondlings occurring in KU's dorms. In 2013 there were 13 forcible sex offenses reported, with 9 of them occurring in KU's dorms. In 2012, there were only 3 forcible sex offenses reported, with two in KU's dorms.

16. In 2014, KU made representations online on the institution's website that KU and its residence halls were a "safe community" and that "Security is a priority." KU officials stated in 2016 that their dorms were "absolutely safe."

17. In Fall of 2014, Plaintiff enrolled at KU as a scholarship member of the school's rowing team.

18.     Early in the 2014-2015 school year, following a Halloween party, Plaintiff went to the Jayhawker Towers, where a group of KU students and athletes had gotten together.

19.     John Doe G arrived at the gathering at the Jayhawker Towers and appeared inebriated.

20.     John Doe G invited Plaintiff into his Jayhawker Towers apartment to watch a television show and then sexually assaulted her.

21.     Plaintiff remained in his apartment in a state of shock and horror until John Doe G said he needed to leave in the morning for football practice.

22.     Plaintiff chose not to report the sexual assault at the time, although she did confide in a teammate regarding what had happened.

23.     Throughout the rest of the 2014-2015 school year, Plaintiff made a valiant effort to a have a normal college experience. Plaintiff attended classes, participated in student senate and the KU rowing team, although she had to take measures to avoid meeting Jon Doe G on campus and experienced panic attacks on campus and when practicing at KU's football stadium.

24.     Plaintiff returned to KU and the KU rowing team for the 2015-2016 academic year.

25.     The head coach of the KU rowing team was and remains Rob Catloth, and the assistant coach was Carrie Callen.

26.     Plaintiff witnessed Coach Catloth make ongoing racial remarks about some rowers and numerous comments about the weight of the female athletes,

calling some of the women "fat" and expressing preferences for women who conformed with more traditional gender norms for the female body.

27.    Over the course of two years, many rowers had reported Coach Catloth's conduct to KU's Senior Woman Administrator Debbie Van Saun, whose responsibility includes overseeing Title IX compliance and gender equity principles.

28.    In early October of 2015, many of the KU rowing team members including Plaintiff met with a KU sports psychologist to discuss their concerns about Coach Catloth and his relentless commentary about their body shapes.

29.    At this meeting, rowing team members discussed fairness to players, racial comments, and comments about players' weight, as well as concerns that their reports to KU administrator Van Saun regarding Coach Catloth's conduct and ongoing commentary about their appearance were ignored and not investigated.

30.    The next week, following a competition, Coach Catloth, Assistant Coach Callen, Van Saun, and the rowing team assistant coach told everyone on the team who participated in the team meeting about Coach Catloth to remain and identify themselves to the coach, and to tell them what had been said.

31.    Many members of the rowing team repeated what they had discussed at the prior meeting, including Coach Catloth's comments and Van Saun's indifference to their reports. For her part, Plaintiff said Coach Catloth should apply fair standards to the players and that he should not be as critical about players' weight.

32.     KU officials had actual knowledge that, prior to October 2015, KU medical staff had attempted to implement a policy requiring Coach Catloth to refer female rowing teams members to a nutritionist if he viewed their weight as a performance issue, instead of calling them "fat" or making other such comments.

33.     KU officials had actual knowledge that Coach Catloth was not abiding by the policy.

34.     KU officials, including Debbie Van Saun, deliberately chose not to make Coach Catloth comply with the policy.

35.     Van Saun also deliberately refused to investigate any of the many reports concerning Coach Catloth's comments about women that she had received in 2014 and 2015.

36.     Later in October of 2015, another KU rowing team member, Sarah McClure, came to Plaintiff and told her that she had also been sexually assaulted by John Doe G at the Jayhawker Towers, and that she had reported the assault to the police and to KU.

37.     After learning of McClure's attack, Plaintiff decided she needed to report John Doe G's conduct also, so she first reported the rape to the rowing team's trainer, who referred her to a KU Athletics Department physician, who referred her to Van Saun, who set up a meeting between Plaintiff and a member of KU's Institutional Opportunity & Access ("IOA") office.

38.     The meeting was scheduled at the same time as a KU rowing team practice.

39.     Plaintiff therefore went to Assistant Coach Callen and asked her if she could miss a practice to participate in the IOA meeting.

40.     Plaintiff also told the Assistant Coach that she had been raped, about the stress she had been experiencing as a result of the rape, worse now after her report, and emphasized to Callen that being a member of the KU rowing team was important to her and was really helping her to cope with the situation.

41.     Assistant Coach Callen told Plaintiff that she needed to tell Coach Catloth that she was going to miss practice.

42.     Plaintiff therefore informed Coach Catloth that she needed to miss practice to meet with someone at the IOA – a missed practice that Coach Catloth later cited as a reason for not allowing Plaintiff to participate in rowing team activities.

43.     Upon information and belief, Coach Catloth learned in October, 2015, or earlier, that Daisy Tackett had been sexually assaulted, having learned of the account from other rowers and coaches on the team.

44.     Plaintiff met with the IOA investigator and provided him details of her assault.

45.     After she met with the IOA investigator, Plaintiff was departing class at Blake Hall on the KU campus, a low-traffic area of campus, when she encountered John Doe G, whom she had never seen at that time and location of campus, staring her down.

46. The experience unnerved her and caused her experience panic, and that same day, Plaintiff reported the encounter to the IOA investigator.

47. Later that same week, Plaintiff again saw John Doe G in front of Watson Library, again at a place and time she had never before encountered him; the KU football player stared her down and called her a derogatory name.

48. Plaintiff again reported the encounter to the IOA investigator.

49. The U.S. Department of Education had issued guidance to the KU that it should "promptly" take steps to protect the complainant once it had notice of a sexual violence allegation, steps that included a campus ban, "no-contact order," or suspension of the assailant, but KU did not implement any of these steps in a prompt fashion.

50. Only after Plaintiff sent a letter specifically demanding relief from KU did KU issued John Doe G a "no-contact order," months after she reported her assault.

51. In response to her reports of on-campus intimidation, KU eventually provided an employee of the IOA office to walk with the Plaintiff from her class at Blake  Hall to Wescoe Hall for her next class. The escort between one class did little to ease Tackett's anxiety and fear of being on campus.

52. During October, November and December of 2015, Plaintiff's anxiety and panic attacks worsened and they would frequently manifest during workouts at the KU football team's stadium.

53.     KU's rowing teams coaches were aware of plaintiff's anxiety, panic attacks, and the demands of the IOA investigation upon her time and emotional state.

54.     Plaintiff also began to withdraw from campus life, avoiding athletic facilities and dining halls where she might encounter John Doe G or his fellow football players.

55.     In early December in 2015, Coach Catloth informed her that he would not allow her to attend an annual training trip to Florida later that month.

56.     Plaintiff told him the details about her rape, the continuing investigation, what she had been coping with, how much the trip meant to her, and asked him what she needed to prove to be fit enough on the trip, and Coach Catloth told her she had a perform a specific time on a 2k-test.

57.     Plaintiff passed the test the very next day.

58.     The next week, the KU rowing coaches published the list of who is going on the training trip, and the Plaintiff was still not on the list, although other rowers with less experience and slower times were on the list.

59.     Sarah McClure, another KU rower who had reported being sexually assaulted by John Doe G, was also not on the list.

60.     Plaintiff therefore met with the coach and showed him the team test results, and showed him that she was faster than many of the people who were selected to go on the trip, but Coach Catloth still would not permit her to travel.

61.    Plaintiff requested from Coach Catloth a letter that would permit her to transfer to another school if necessary and told him that the rape and stalking in addition to the rowing team issues may force her to leave.

62.    She then met with Coach Catloth and the Assistant Coach in the Coach's office, where he told her that he would give her the letter but not let her transfer to another school in the Big 12.

63.    KU officials were aware of Catloth's refusal to allow her to transfer to another Big XII school.

64.    Plaintiff's father contacted the IOA office on December 7, 2015, and informed KU that KU's rowing coach had blocked plaintiff from attending the trip.

65.    KU's interim director of IOA, Joshua Jones, wrote Plaintiff's father an email dated December 8, 2015 that stated:

> Good Morning James,
>
> Thank you for reach out to me. I am aware that Daisy is on the standby list for the Winter Training trip. Athletics makes those decisions and they are made without consideration of any pending IOA matters. My understanding is that Daisy has been talking to her oach about the decision and I encourage that dialogue to continue.
>
> Joshua S. Jones.

66.    Plaintiff caused a four-page letter to be sent to KU's IOA office via U.S. Mail and email on December 9, 2015, that informed KU the following:

a. She was one of at least two women who had reported that KU's football player, John Doe G, had sexually assaulted them.

b. His continued presence on campus was creating a hostile educational environment.

c. Coach Catloth and the rowing team staff, "which had full knowledge of Ms. Tackett's reported raped and participating in the university's investigation, has decided to not allow her to participate in a training trip with the team despite her complete qualification for the training."

d. Coach Catloth had told her she could not travel with the team, that she should seek a transfer out of KU, and that he would not allow her to transfer to any other Big 12 school.

e. Plaintiff considered these actions retaliatory.

f. KU had not issued a "no-contact" order to John Doe G, despite the passage of many weeks, and despite actual knowledge that he had acted to intimidate Plaintiff on campus.

g. Plaintiff wanted KU to ban John Doe G during the pendency of the investigation, provide the KU football team with additional training regarding sexual violence, adopt and enforce effective policies to stop sexual assaults from happening at Jayhawker Towers, and to educate Coach Catloth "regarding the University's obligation to not retaliated against Ms. Tackett …"

67.     KU administrators whose duty it was to investigate and enforce Title IX compliance had actual knowledge and indeed condoned Coach Catloth's decisions to not let Plaintiff to participate on the rowing team and to not let her transfer to

another Big 12 school, even though she was fully qualified to participate on the team.

68. Coach Catloth never permitted her to travel with the team on the trip, even though an extra spot opened on the trip.

69. KU permitted John Doe G to remain on campus and to participate in the KU football practices throughout the pendency of KU's supposed investigation in Plaintiff's report.

70. KU has an official policy that requires female rowers to attend KU football games, and to cheer and encourage the football players as they enter the field.

71. Even two rowers like Plaintiff and Sarah McClure, who had been sexually assaulted by a KU football player, were encouraged and expected to attend and root on the KU football players under KU's policy.

72. KU has an official policy and practice of entertaining football recruits in hotels just off campus and encouraging female KU athletes to attend parties with the recruits.

73. After winter break, Plaintiff returned to KU for the next semester in January of 2016, and she attended approximately one week worth of classes.

74. KU still had not suspended or expelled John Doe G or concluded its investigation into Plaintiff's report.

75. Plaintiff met with the Coach Catloth a final time, and he stated, falsely, that she was not allowed to go on the trip because of her weight and because

she had skipped body weight exercises at KU's football stadium, including the date she had to attend the IOA interview.

76.     Plaintiff decided she had no choice but to withdraw from KU – the University obviously valued its athletic programs over her.

77.     Plaintiff told Coach Catloth that she did not want to quit, but that she needed to leave KU until the investigation into her report was completed. Coach Catloth told them that he would consider allowing her back on the team when she came back. And then he told her not to worry about returning her equipment.

78.     Plaintiff met with the IOA and reported Coach Cathloth's retaliation against her.

79.     Upon information and belief, Coach Catloth retaliated against Plaintiff and Sarah McClure because he did not want scrutiny drawn to his history of interactions with his female rowers.

80.     IOA interim director Joshua Jones told Plaintiff that KU would allow her to withdraw from the university without having to pay for the rest of the semester.

81.     KU treated another rower, Sarah McClure, who had also reported a sexual assault by the same KU football player at the Jayhawker Towers, in a similar fashion to the facts alleged above.

82.     Plaintiff returned home to Florida.

83.     In February of 2016, despite KU's assurances, Plaintiff received an email from the rowing coaches, at the direction of Coach Catloth, asking for her to

return her equipment, which consisted of spandex sweatpants, t-shirts and sports bras she had used that semester.

84.     Plaintiff also received a letter from KU informing her that it would be billing her for the semester and that the bill would be subject to collections if not paid on time, even though KU had promised she would not have to pay.

85.     KU also placed an administrative hold on her transcripts.

86.     KU had an official policy of placing KU athletes, in particular KU football players, in KU's Jayhawker Towers Apartments, where they would receive less supervision than other residence hall options.

87.     KU knew that sexual assaults were occurring at a high rate at Jayhawker Towers.

88.     KU failed to provide adequate supervision, warnings, training, guidance and education to its athletes and KU football players in particular at Jayhawker Towers.

89.     The likelihood of such misconduct was so obvious that KU's failure to supervise amounted to deliberate indifference to the rights of Daisy Tackett.

90.     In March of 2016, more than four months after her report, KU informed Ms. Tackett that John Doe G had agreed to be expelled.

**New Pleadings Regarding Fraudulent Misrepresentations Discovered After September 9, 2016**

91.     On February 23, 2016, KU sent Daisy Tackett a letter stating that it had "recommended to Student Affairs that [John Doe G] be permanently expelled from the University of Kansas." *Ex. 1.*

92.     On March 16, 2016, KU represented that John Doe G would agree to an immediate expulsion to avoid a hearing: "Yes, the student would be removed and banned immediately. He would not finish the semester." *Ex.2.*

93.     On the basis of this representation of an expulsion, Daisy Tackett consented to the proposal.

94.     On March 18, 2016, KU then sent Daisy Tackett a letter stating that "[John Doe G] has been effectively permanently expelled from the University of Kansas. He was withdrawn from the University effective March 17, 2016." *Ex.3.*

95.     The March 18, 2016 letter further stated: "A notation will be placed on Mr. [John Doe G]'s transcript." *Ex.3.*

96.     The March 18, 2016 letter further stated: "This outcome achieves everything that would have been sought during the formal hearing and the University understands that you are in agreement with the resolution." *Ex.3.*

97.     However, based upon media reports that surfaced in September of 2016, KU sent John Doe G a different letter that informed him he was being allowed to withdraw in lieu of expulsion.

98.     KU's actions facilitated John Doe G's subsequent enrollment at Indiana State University, where he joined that institution's football team along with a former KU football coach.

99.     KU engaged in a similar series of misrepresentations to the other victim of John Doe G, Sarah McClure.

17

100.   On March 2, 2016, KU sent Sarah McClure a letter stating that they were recommending that John Doe G "be permanently expelled from the University of Kansas." *Ex.4.*

101.   On March 17, 2016, KU sent Sarah McClure an email stating that John Doe G had requested to resolve the case without a hearing and that he was "willing to effectively agree to everything we would seek in a hearing." The email stated that the proposed outcome included that "[John Doe G] would be effectively permanently expelled. He will be immediately withdrawn…." and that he "will have a transcript notation. The transcript notation would be included on transcripts sent to other schools." *Ex.5.*

102.   On March 18, 2016, KU sent Sarah McClure a letter stating that they understood "that you also expressed to IOA a desire for [John Doe G] to be expelled" and to go forward with the hearing. *Ex.6.*

103.   That March 18, 2016, letter to KU further stated:

You were informed that [John Doe G] had approached the university with a request that the charges be resolved without a hearing. You were informed that [John Doe G] was willing to be effectively permanently expelled from the university, with a transcript notation, a ban from campus for ten years, and agreement to have no contact with you. From the university's perspective, this achieved what you requested and what was possible to obtain through the formal hearing process. … I have concluded that the outcome capable of being reached without a hearing achieves everything that would have been sought during the formal hearing and is consistent with the final recommendation from the IOA investigators…. As a result, I have determined that is appropriate to resolve this matter without a hearing."

*Ex.6.*

104.    The same letter describes John Doe G's status as being "permanently separated" and "effectively permanently expelled from the University of Kansas" and that he "was withdrawn from the University effective March 17, 2016." *Ex.6.*

105.    KU concealed the fact that they were allowing John Doe G to withdraw from the University in lieu of expulsion.

106.    KU misrepresented to Plaintiff that John Doe G was being expelled.

107.    KU misrepresented to Plaintiff that John Doe G would have a transcript notation that would transmitted to other schools.

108.    KU permitted John Doe G to withdraw in lieu of expulsion while leading Plaintiff to belief he had been expelled for fear of being sued by John Doe G.

109.    KU's actions were designed to enable John Doe G to go to a new football team.

110.    KU's concealment of the actual outcome displays deliberate indifference to the rights of the Plaintiff under Title IX, by deliberately misleading her as to the punishment John Doe G actually received.

111.    The letter to the victim and the perpetrator should have been the same.

## COUNT I: TITLE IX DISCRIMINATION – HOSTILE EDUCATIONAL ENVIRONMENT

112.    Plaintiff hereby adopts and incorporates the allegations set forth in paragraphs 1 through 111 above as though fully set forth herein.

113.    Plaintiff is a member of a protected class.

114.   Plaintiff suffered discrimination and harassment on the basis of her gender when her coach made comments about her weight and refused to allow her to participate in her sport.

115.   Plaintiff suffered sexual harassment at the hands of a KU student and football player, in a KU dorm with a long history of sexual assaults.

116.   Plaintiff also suffered discrimination and harassment on the basis of her participation in a Title IX complaint when the KU football player twice encountered her on campus, staring her down and then calling her a threatening, derogatory name.

117.   KU had actual knowledge that Plaintiff had been sexually harassed, that Coach Catloth was making inappropriate comments, denying her opportunities, and that John Doe G had twice sought to intimidate her on campus.

118.   KU was deliberately indifferent to harassment Plaintiff suffered, in that:

a. KU had a policy of placing KU athletes and football players in the Jayhawker Towers knowing that they would receive less supervision, and knowing that there was a high likelihood of sexual misconduct occurring.

b. KU failed to take reasonable steps to prevent sexual assaults from occurring at Jayhawker Towers, including failing to train employees properly on preventing, investigating and punishing sexual assaults on campus, and failing to adopt and implement simple, reasonable policies that would lessen the chance of rapes occurring, harassment occurring, or retaliation from occurring.

c. KU failed to immediately issue a "no contact" order to John Doe G after receiving two independent reports of sexual assaults involving him.

d. KU failed to immediately suspend John Doe G pending the outcome of KU's investigation following two independent reports of sexual assault.

e. KU failed to ban John Doe G from campus pending the outcome of KU's investigation following two independent reports of sexual assault.

f. KU failed to conduct an expedient investigation or hold a timely hearing in order to resolve Plaintiff's report.

g. KU failed to take any action on Plaintiff's report and other KU rowing team members' reports of inappropriate comments from their rowing coach.

h. KU failed to stop John Doe G from harassing the Plaintiff after she reported his sexual assault.

i. KU failed to stop the KU rowing coach from retaliating against the Plaintiff for participating in the Title IX process.

119.   KU's conduct is prohibited by Title IX.

120.   The harassment was unwelcome, severe, pervasive and objectively offensive and deprived plaintiff to access of the educational benefits and opportunities KU offered, including:

a. A sexual assault in a KU dormitory;

b. Intimidation by a KU football player on campus;

c. Refusal by KU to suspend or ban the offending KU football player from campus during the investigation;

d. Offensive comments regarding the Plaintiff's weight;

e. Deliberate refusal to allow her to participate in team activities;

f. Deliberate refusal to allow her to participate in rowing activities at other schools.

121. The harassment had the systematic effect of depriving plaintiff of access to educational benefits or opportunities.

122. Furthermore, Defendant KU deliberately failed to supervise employees that had the means and authority to stop the harassment Plaintiff experienced.

123. Defendant KU's corrective or preventive opportunities regarding plaintiff's report of sexual harassment and retaliation were unreasonable or inadequate.

124. Defendant KU's indifference and resulting inaction was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being.

125. As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed educational opportunities and out-of-pocket costs.

126. Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

127.   WHEREFORE, Plaintiff prays for an award of actual damages against Defendant in an amount in excess of $75,000, for attorneys fees together with interest and costs of suit, for disgorgement of tuition and board payments made on her behalf, for order enjoining KU from continuing to place administrative holds on her transcripts, and for such and further legal and equitable relief as is deemed just and proper.

## COUNT II: TITLE IX RETALIATION

128.   Plaintiff hereby incorporates  and reasserts the allegations contained in paragraphs 1 – 111.

129.   Plaintiff engaged in a protected activity under Title IX when she:

a. Reported her sexual assault.

b. Reported Coach Catloth's treatment and comments toward herself and other female members of the KU rowing team.

c. Participated in a group meeting with a KU employee regarding Coach Catloth's treatment of the Rowing Team women and KU administrator Van Saun's lack of effective response.

130.   Contemporaneously with her protected activity, Plaintiff suffered averse actions, including:

a. Acts of intimidation and witness tampering on campus.

b. Denial of access to rowing team activities.

c. Acts to collect bills and equipment.

d. Refusal to permit her to participate in rowing at other schools.

e. Holds placed on her records.

131.   Plaintiff's protected activity and the adverse actions are causally connected in that:

a. Plaintiff's protected activity and KU's adverse actions occurred within days of one another.

b. The KU football player John Doe G engaged in on-campus harassment and intimidation of Plaintiff immediately after being contacted by KU regarding Plaintiff's report.

c. Coach Catloth's decision to deny her access to the team trip came immediately after Plaintiff reported to him and the KU administrator in their presence that he was engaging in unfair treatment and making inappropriate comments about the weight of the women in his program.

d. KU administrator Debbie Van Saun, who was a subject of the rowing team's complaints, and who failed to act on the rowing team's complaints about Coach Catloth, and who responded to Plaintiff's report of a rape, deliberately failed to stop John Doe G or Coach Catloth from retaliating against Plaintiff.

e. Coach Catloth's reason for not bringing Plaintiff on the team trip – her alleged fitness level – is pretextual, in that she literally and objectively met his stated requirements and other athletes with slower times and less experience were permitted to go.

132.   Defendant KU's administration had actual knowledge of the retaliation Plaintiff was suffering.

a. Administrators knew Plaintiff was subjected to a sexual assault on campus;

b. Administrators knew Plaintiff was subject to intimidation and harassment on campus;

c. Administrators knew that Plaintiff's rowing coach had treated her unfairly and made inappropriate comments about her weight and the appearance and weight other female team members in her presence;

d. Administrators knew that Plaintiff's rowing coach was not permitting her to travel with the team despite her absolute qualification to do so.

e. Administrators knew that KU had not been responding effectively to Plaintiff's and the Rowing Team's reports concerning Coach Catloth.

133.   Defendant KU did not adequately respond to the retaliation in that:

a. KU knew retaliation was likely following her report of rape but took no proactive steps such as issuing an immediate "no contact" order or suspending John Doe G, or ban him from campus, despite having two independent reports of sexual assault involving him.

b. After receiving Plaintiff's first report of on-campus intimidation, KU failed to suspend John Doe G, ban him from campus, or issue a "no contact" order.

c. After receiving Plaintiff's second report of on-campus intimidation, KU failed to suspend John Doe G or ban him from campus, and instead provided her with an escort between only one of her classes.

d. KU failed to conduct a timely investigation or hold a hearing in a timely fashion.

e. KU failed to stop Coach Catloth from engaging in unfair treatment or making inappropriate comments about women's appearances and weight.

f. KU failed to stop Coach Catloth from denying her access to the team training event in Florida.

g. KU failed to release Plaintiff completely to compete for another school's rowing team.

h. KU failed to stop itself from seeking to unjustly enrich the institution by keeping Plaintiff's tuition and board payments while denying her access to the education and safe housing it promised her.

i. KU failed stop itself from sending a letter requesting Plaintiff to send back all of her used team clothes despite the pettiness of such a request and the coach's own representation that Plaintiff did not have to do so.

j. KU failed to stop itself from placing an administrative hold on Plaintiff's records.

134.   An appropriate person had actual knowledge of the discrimination and harassment suffered by Plaintiff.

135.   Furthermore, Defendant KU deliberately failed to supervise employees that had the means and authority to stop the harassment Plaintiff experienced.

136.   Defendant KU's indifference and resulting inaction was deliberate, wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being.

137.   As a direct and proximate result of defendant's conduct, Plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed educational opportunities and out-of-pocket costs.

138.   Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

WHEREFORE, Plaintiff prays for an award of actual damages against Defendant in an amount in excess of $75,000, for attorneys fees together with interest and costs of suit, for disgorgement of tuition and board payments made on her behalf, for order enjoining KU from continuing to place administrative holds on her transcripts, and for such and further legal and equitable relief as is deemed just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury as to all triable issues.

Respectfully submitted,


/s/Dan Curry
Dan Curry, KS22750
Sarah Brown, KS12130
BROWN & CURRY, LLC
406 W. 34th Street, Suite 810
Kansas City, MO 64111
(816) 756-5458
dan@brownandcurry.com
sarah@brownandcurry.com
ATTORNEYS FOR PLAINTIFF



Institutional
Opportunity & Access

## CONFIDENTIAL

February 23, 2016

Daisy Tackett
███████████████████

Re: Complaint with the Office of Institutional Opportunity and Access (IOA)
Complaint #15-087

## VIA ELECTRONIC MAIL

Dear Ms. Tackett;

This is to inform you that the investigation into the allegations that ████████ ████████████ violated the University's *Sexual Harassment Policy* has been completed. I have submitted a report of this investigation to Lance Watson, Director of Student Conduct and Community Standards.

This complaint was handled in accordance with the *KU Discrimination Complaint Resolution Process.* IOA used a preponderance of the evidence standard. The preponderance of the evidence standard means that the facts in issue are more probably true than not. Based on the preponderance of the evidence, there is sufficient evidence to demonstrate that ████████████ violated *KU's Sexual Harassment Policy* in that ████████████████ engaged in sexual intercourse with you without consent. ████████████████ unwelcome actions were severe enough to interfere with your academics and/or participation in University activities.

IOA has considered the severity of the conduct and the need to remedy the effects of the conduct as well as ensure that the conduct does not continue. With that in mind, IOA has recommended to Student Affairs that ████████████ be permanently expelled from the University of Kansas.

Thank you for your cooperation with this investigation. If you have any questions you may contact me at (785)864-6414 or by email at ███████████████████

<div style="border:1px solid red; display:inline-block">Exhibit 1</div>

Office of Institutional Opportunity and Access
Carruth-O'Leary | 1246 West Campus Road, Room 153 | Lawrence, KS 66045-7521 | (785)864-6414 | Fax (785)864-8089 | www.
ioa.ku.edu

Sincerely,

Joshua Jones
Interim Director


Cc:     Lance Watson, Director of Student Conduct and Community Standards
        Jane Tuttle, Associate Vice Provost for Student Affairs
        Debbie Van Saun, Senior Associate Athletics Director/Senior Woman Administrator
        Dan Curry, Attorney for Daisy Tackett

Office of Institutional Opportunity and Access
Carruth-O'Leary | 1246 West Campus Road, Room 153 | Lawrence, KS 66045-7521 | (785)864-6414 | Fax (785)864-8069 | www.
ioa.ku.edu



Dan Curry <dan@brownandcurry.com>

---

## RE: Hearing File Available
1 message

---

**Watson, Lance** <lancewatson@ku.edu>                          Wed, Mar 16, 2016 at 4:01 PM
To: Dan Curry <dan@brownandcurry.com>
Cc: "Rolf, Rachel" <rrolf@ku.edu>

Dan,

1. We can seek agreement for a 10-year ban.

2. No. This is contrary to KU practice. Transcript notations are noted as either academic or nonacademic misconduct. This would be the case even with a hearing panel finding.

3. Yes, the student would be removed and banned immediately. He would not finish the semester.

4. No. Fines are imposed as restitution to the University, for example, in cases where there has been damage to university property, etc.

Lance

**From:** Dan Curry [mailto:dan@brownandcurry.com]
**Sent:** Wednesday, March 16, 2016 3:23 PM
**To:** Watson, Lance <lancewatson@ku.edu>
**Subject:** Re: Hearing File Available

Lance, Daisy has these questions:

1. Can it be a 10-year ban from campus?

2. Can the notation be that he was expelled for sexual assault?

3. Is the expulsion immediate?

4. Can he be fined?

Any explanation for a "no" would be appreciated.

Dan Curry

Brown & Curry, LLC

406 W. 34th Street, Suite 810

Exhibit 2

KU STUDENT AFFAIRS
The University of Kansas

March 18, 2016

Daisy Tackett
Sent electronically to

**PERSONAL AND CONFIDENTIAL**

Dear Daisy,

I am writing to inform you of the outcome of the conduct case involving Mr. John Doe G.

On October 28, 2015, Institutional Opportunity and Access (IOA) learned from Senior Associate Athletics Director Debbie Van Saun that you had reported that you had been sexually assaulted the previous academic year. You agreed to participate in an investigation which concluded on February 23, 2016 when IOA released its findings; specifically, that Mr. John Doe engaged in non-consensual sex with you. Further, IOA recommended that Mr. John Doe be permanently expelled from the university.

On February 26, 2016, a formal hearing was scheduled for Monday, March 11, 2016 to resolve an alleged violation of the *Code of Student Rights and Responsibilities* by Mr. John Doe G. The hearing was then delayed to March 21, 2016. You agreed to participate in the hearing and provide solely a victim impact statement.

This letter confirms that this matter has been resolved to your satisfaction, without a hearing on the following terms:

- Mr. John Doe has been effectively permanently expelled from the University of Kansas. He was withdrawn from the University effective March 17, 2016. He is not eligible for readmission.
- A notation will be placed on Mr. John Doe 's transcript.
- Mr. John Doe has been banned from campus for a period of ten years.
- The no contact directive between Mr. John Doe and you will remain in place. He is not to have contact with you in-person, by electronic means, or other methods of communication. This includes him mentioning, referencing, or tagging you in any social media.

This outcome achieves everything that would have been sought during the formal hearing and the University understands that you are in agreement with the resolution. The University is confident that this outcome addresses your interests and those of the University community. The University is an agency of the State of Kansas, and this letter is intended to serve as a notice of a final agency action by the University of Kansas. Chancellor Bernadette Gray-Little is the agency officer who should receive any service on behalf of the University of any subsequent petition for judicial review of this action.

Daisy, if you have any questions regarding this agreement, please feel free to contact me at 785-864-4060.

Sincerely,

Tammara Durham, Ed.D.
Vice Provost for Student Affairs

CC:   Dan Curry, Advisor and Counsel to Mr. Tackett

Exhibit 3



**Institutional
Opportunity & Access**

## **CONFIDENTIAL**

March 2, 2016

Sarah McClure



Re:  Complaint with the Office of Institutional Opportunity and Access (IOA)
      Complaint #15-077

## **VIA ELECTRONIC MAIL**

Dear Ms. McClure;

This is to inform you that the investigation into the allegations that ███████ ████████ violated the University's *Sexual Harassment Policy* has been completed.  I have submitted a report of this investigation to Lance Watson, Director of Student Conduct and Community Standards.

This complaint was handled in accordance with the *KU Discrimination Complaint Resolution Process*.  IOA used a preponderance of the evidence standard.  The preponderance of the evidence standard means that the facts in issue are more probably true than not.  Based on the preponderance of the evidence, there is sufficient evidence to demonstrate that ██████████ violated *KU's Sexual Harassment Policy* in that ██████████ engaged in the act of touching your breasts without your consent.  ████████████ unwelcome actions were severe enough to interfere with your academics and/or participation in University activities creating a hostile environment.

IOA has considered the severity of the conduct and the need to remedy the effects of the conduct as well as ensure that the conduct does not continue.  Although this case alone may not have resulted in an expulsion, IOA considered the entirety of IOA's record with regard to ██████████  With that in mind, IOA has recommended to Student Affairs that ████████ be permanently expelled from the University of Kansas.

Exhibit 4

Thank you for your cooperation with this investigation.  If you have any questions you may contact me at (785)864-6414 or by email at █████████

Sincerely,

*Joshua Jones*

Joshua Jones
Interim Director

Cc:  Lance Watson, Director of Student Conduct and Community Standards
     Jane Tuttle, Associate Vice Provost for Student Affairs
     Debbie Van Saun, Senior Associate Athletics Director/Senior Woman Administrator

9/30/2016



**Dan Curry <dan@brownandcurry.com>**

**From:** "Watson, Lance" <lancewatson@ku.edu>
**Date:** March 17, 2016 at 3:06:53 PM EDT
**To:** Sarah McClure
**Subject: Case Update**

Sarah,

As we shared on the phone, the respondent has requested to resolve the case without a hearing.  From my perspective, he is willing to effectively agree to everything we would seek in the hearing.  It is within the University's discretion to resolve the case, but we did want to get your thoughts.  The proposed outcome it as follows:

1.    He will be effectively permanently expelled. He will be immediately withdrawn and not eligible for readmission to the University.

2.    He will have a transcript notation. The transcript notation would be included on transcripts sent to other schools. The resolution does not change the University's ability under the law to respond to inquiries from other schools.

3.    He will be immediately banned from campus for a period of ten years.  We believe this gives you ample opportunity to finish your education, including any graduate work at KU, without having to worry about his being on campus (even as a non-student).

4.    The no contact directive will remain in place.

This resolution would not impose any restriction on you.  The resolution will bring certainty and immediate finality to this matter for you, as it would not be subject to an internal appeal or potential litigation by the respondent, which could go for years.  If you or your attorney have questions, please let me know.  We would like to make a decision by 4pm, so any input would be appreciated before then.


Thank you,


Lance


―――――――

## Lance A. Watson


Director of Student Conduct & Community Standards

University of Kansas

1450 Jayhawk Blvd.

Strong Hall, Room 133

Lawrence, KS 66045


Office: 785-864-4060

Fax: 785-864-4050

Email: lancewatson@ku.edu


*Confidentiality Notice: The information contained in this email transmission is confidential information, proprietary to the sender and legally protected. If you are not the intended recipient, you are hereby notified that any dissemination, copying or taking any action in reliance on the contents of this information is strictly prohibited. If you received this message in error, please notify the sender of the error and delete this message and any attachments. Thank you.*


Exhibit 5

**KU STUDENT AFFAIRS**
**The University of Kansas**

March 18, 2016

Sarah McClure
Sent electronically to ███████████████

**PERSONAL AND CONFIDENTIAL**

Dear Sarah,

I am writing to inform you of the outcome of the conduct case involving ██████████
I am currently out of the office but wanted to ensure that you received this letter.

On October 19, 2015, the Office of Institutional Opportunity and Access (IOA) was made aware
by KU Public Safety that you reported to them that ██████████ had fondled your breasts.
You agreed to participate in an investigation by IOA, which concluded on March 2, 2016. IOA
found that the preponderance of the evidence supported that ██████████ violated the
university's Sexual Harassment Policy when he fondled your breasts without consent. Further,
IOA recommended that if this was the only finding against ██████████ its recommendation
would be that he be placed on disciplinary probation, attend educational sessions around sexual
harassment and consent, and that he be banned from the Jayhawker Towers. However, because
this was IOA's second finding against ██████████ they recommended he be permanently
expelled from the university. I understand that you also expressed to IOA a desire for ██
██████████ to be expelled.

On March 11, 2016, a formal hearing was scheduled for Monday, March 28, 2016 to resolve an
alleged violation of the *Code of Student Rights and Responsibilities* by ██████████
based upon the above complaint. You contacted Lance Watson, Director of Student Conduct and
Conflict Resolution, requesting the hearing be delayed as your attorney was not available for
March 28th, but did not specify a date. You agreed to participate in the hearing when it did take
place.

You were informed that ██████████ had approached the university with a request that the
charges be resolved without a hearing. You were informed that ██████████ was willing to
be effectively permanently expelled from the university, with a transcript notation, a ban from
campus for ten years, and agreement to have no contact with you. From the university's
perspective, this achieved what you requested and what was possible to obtain through the
formal hearing process. You were given an opportunity to share your thoughts. You have
indicated that you did not agree with the matter moving quickly to resolution, and were
suspicious of why there is a need to have this resolved. Further, you indicated you want ██
██████████ to go through training and apologize to you. As was shared, when a student is
permanently separated from the University, the student is not asked to complete remedial work,
because the University has no way to enforce these requirements upon separation. I appreciate
and have considered your concerns. I have concluded that the outcome capable of being reached
without a hearing achieves everything that would have been sought during the formal hearing
and is consistent with the final recommendation from the IOA investigators. Resolution also
brings finality to this matter for you. As a result, I have determined that it is appropriate to
resolve this matter without a hearing.

Exhibit 6

As such, this letter confirms that this matter has been resolved without a hearing on the following terms:

- ██████████████ has been effectively permanently expelled from the University of Kansas. He was withdrawn from the University effective March 17, 2016. He is not eligible for readmission.
- A notation will be placed on ████████████ transcript.
- ████████████ has been banned from campus for a period of ten years
- The no contact directive between ████████████ and you will remain in place. He is not to have contact with you in-person, by electronic means, or other methods of communication. This includes him mentioning, referencing, or tagging you in any social media.

I am also aware that you expressed concerns regarding how we will seek to inform the football team about the university's expectations around sexual violence and shared that the team needs additional training. I personally met with the entire football team twice in the Fall Semester to provide training on sexual harassment and sexual violence. Along with the Director of the Sexual Assault Prevention and Education Coordinator (SAPEC), I also met with the entire football team at the beginning of March to provide training. Further, the Director of SAPEC will be returning to provide further education to the team around sexual harassment and consent in April. If you would like to speak more about addressing this issue with the football team, I would be happy to speak with you. Further, if you receive outreach from members of the football team or persons you believe are acting on ████████████ behalf, please report it to my office as soon as possible.

The University is an agency of the State of Kansas, and this letter is intended to serve as a notice of a final agency action by the University of Kansas. Chancellor Bernadette Gray-Little is the agency officer who should receive any service on behalf of the University of any subsequent petition for judicial review of this action.

Sarah, if you have any questions regarding this agreement, please feel free to contact me at 785-864-4060.

Sincerely,

Tammara Durham, Ed.D.
Vice Provost for Student Affairs

CC:   Dan Curry, Counsel to Ms. McClure
      Sarah Brown, Counsel to Ms. McClure