**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **DAISY TACKETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16-cv-2266-JTM-GEB** |
| | ) | |
| **UNIVERSITY OF KANSAS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**</u>

Plaintiff hereby opposes the Defendant University of Kansas' Motion to Dismiss her Amended Complaint.

**A.      Nature of the Matter before the Court.**

Daisy Tackett brings Hostile Educational Environment and Retaliation claims against Defendant KU under Title IX for four related actions by KU:

First, a KU football player raped Tackett at a dorm, the Jayhawker Towers, where KU purposely placed football players knowing they would have less supervision and that sexual assaults were a problem there, and indeed, a likely and predictable outcome. KU's policy of placing female athletes in a subservient position coupled with its policy of concentrating its football players in a dorm with less supervision and a documented problem of sexual assaults creates liability under the *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007). This is a landmark Tenth Circuit case on Title IX liability that Defendant KU has refused to discuss in its original and renewed Motions to Dismiss, even after Plaintiff detailed KU's liability under this theory in Plaintiff's original opposition to KU's motion.

Second, after Tackett reported the rape to KU, KU failed to conduct an expedient investigation, suspend her assailant, or even stop its football player from harassing her on campus, despite knowing such harassment was foreseeable and likely. KU's Title IX administrators knew that the U.S. Dept. of Education had issued guidance putting the university on notice that reprisals against the victim for reporting her assault were predictable and that investigations ought to take two months or less. The university should have suspended John Doe G immediately after learning he had assaulted not one, but two female students in its dorms. Instead, KU tarried – it claims it tarried because it was afraid of being sued by John Doe G – and its delay harmed Tackett. KU's football player twice intimidated her on campus before KU took any action at all to stop him. Tackett had to attend school and practices knowing that John Doe G was still on campus. KU now strives to make John Doe G's intimidation seem small, but at the time she reported it, KU conceded his conduct "could be considered retaliation…" *See* ECF Doc. 25, Ex. 2. A "lengthy and unjustified delay" in implementing remedial measures can establish "deliberate indifference." *Hayut v. State University of New York*, 352 F.3d 733, 751 (2d. Cir. 2003). *See also Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 649 (1999)(five month delay in responding to complaints could show "deliberate indifference").

Third, after Daisy Tackett reported her rape to KU, and after she reported and objected to her male rowing coach's insulting "fat" comments, her rowing coaches denied her access to rowing team activities. Coach Catloth had an open preference for female rowers who conformed with stereotypical notions of female beauty; he was concerned that Daisy's rape and objections to his comments would draw scrutiny to his program and his relationships with rowers, and so he retaliated against her by driving her off the team. KU medical officials had attempted to implement a policy designed to require Catloth to refer rowers to a nutritionist rather than

harangue them about body appearance, but KU's administrator charged with overseeing Title IX compliance and gender equity refused to enforce the policy. The same Title IX administrator refused to investigate Tackett's complaints and other rowers' complaints about Catloth's conduct. KU administrators absolutely knew Catloth was retaliating against Tackett, and they were indifferent to it – they simply told her he was empowered to cut her out of team activities. Failure to conduct an investigation is evidence that a plaintiff's protected activity is causally related to retaliatory actions, and that the school is "deliberately indifferent." *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1243-1248 (10th Cir. 1999)(failure to investigate reports reflected "deliberate indifference"); *Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1201 (10th Cir. 2015)(failure to conduct competent investigation is evidence of causal link between protected activity and adverse action).

Fourth, and these are allegations are contained in the proposed Second Amended Complaint, KU displayed deliberate indifference to Tackett by deliberately misrepresenting to her what would happen to John Doe G. KU repeatedly stated to Daisy Tackett that John Doe G would be expelled. But KU told John Doe G that he would be allowed to resign – a far different outcome. John Doe G was then able to transfer to Indiana State University and join its football team, following a KU coach to that team. KU's calculated decision to misinform Tackett about what would happen to John Doe G amounts to "clearly unreasonable methods of handling student reports of sexual violence" and therefore constitutes deliberate indifference.

**B.**     **Concise statement of facts.**

**1.  KU's policies increased the chances that Plaintiff would be raped.**

Tackett enrolled at KU in Fall of 2014 as a scholarship member of KU's rowing team. Amended Complaint, ECF Doc.22, ¶17. Prior to her enrollment, KU advertised its dorms as

"safe community" where "[s]ecurity is a priority." *Id.,* ¶16. However, KU's data collection showed that KU had a problem with sexual assaults on campus, particularly in its Jayhawker Towers, and its former police chief and chair of its sexual assault taskforce conceded that it was KU's biggest problem, as the number of reported assaults had sharply increased in recent years, and for every reported assault, there are eight that go unreported. *Id.,* ¶11-15. With regard to the Jayhawker Towers, KU had a policy of placing its football players in that dorm, where they would receive less supervision than in other dorms. *Id.,* ¶86. KU had actual knowledge that sexual assaults were occurring at a high rate in the Jayhawker Towers. *Id.,* ¶87. Yet KU failed to provide adequate supervision, warnings, training, guidance or education to its athletes and football players at the Jayhawker Towers. *Id.,* ¶88. KU also had a policy of encouraging female rowers to attend KU football games in order to cheer for the football players. *Id.,* ¶70-71. KU also held off-campus parties for football recruits and encourage female athletes to attend these parties to entertain them. *Id.,* ¶72.

In this context, John Doe G, a KU football player, sexually assaulted Tackett in his dorm room at the Jayhawker Towers. *Id.,* ¶18-21.

Daisy confided in a teammate what had happened but did not choose to report the sexual assault at that time. *Id.,* ¶22. Other rowers and coaches on the rowing team came to know she had been assaulted, including the head coach, Coach Catloth. *Id.,* ¶25, 36, 43. For the remainder of the school year, she made a valiant effort at having a normal college experience, attending class, participating student senate and the KU rowing team, all the while taking care to avoid John Doe G and cope with panic attacks that would afflict her when the rowing team worked out at the KU football facility. *Id.,* ¶23. She returned to KU for the 2015-2016 school year. *Id.,* ¶24.

### 2.   KU's Hostile Educational Environment on the Rowing Team

Over the course of two years, many female rowers had reported Catloth's habit of calling some women "fat" and demonstrating a preference for women who conformed to more traditional gender norms for the female body. *Id.*, ¶26. Tackett had witnessed Catloth make numerous comments about the weight of her fellow female athletes. *Id.*, ¶26. Many female rowers over the course of two years reported their concerns about Catloth to KU's Senior Woman Adminstrator, Debbie Van Saun, whose job it was to oversee Title IX compliance and gender equity. *Id.*, ¶27. Van Saun displayed indifference to their reports, and deliberately chose to ignore them and not perform an investigation. *Id.*, ¶29, 31, 35.

Prior to October 2015, KU medical staff, including its sports psychologist, had actually attempted to respond to the rowers' complaints by developing a policy that would have required Catloth to refer rowers to a nutritionist if he viewed their weight as a performance issue, instead of calling them "fat" or making similar comments. *Id.*, ¶32. But KU knew that Catloth did not follow the policy; and Van Saun deliberately chose not to make him comply. *Id.*, ¶33-34.

Then in early October 2015, KU rowing team members met with the KU sports psychologist and relayed concerns about his relentless commentary about their body types and how Van Saun was not investigating their reports and appeared to be ignoring them. *Id.*, ¶28-29.

The next week Catloth and Van Saun told the rowers to identify themselves if they had met with the sports psychologist and to repeat what they had said. *Id.*, ¶30. Rowers repeated their concerns about the Coach's comments and Van Saun's indifference to their reports. *Id.*, ¶30.

### 3.   Daisy Tackett's Protected Activity

At the Coach-ordered meeting, Tackett told Catloth in the presence of Van Saun that he should apply fair standards to players and not be critical about players' weight. *Id.*, ¶31.

Later that month, in October of 2015, a second rower, Sarah McClure, approached Tackett and told her that she had been sexually assaulted by the same KU football player at the Jayhawker Towers, and had reported it to KU and the police. *Id.*, ¶36. Daisy then decided that she should report her assault to KU, so she reported it to the KU rowing team trainer, a KU athletics department physician, Van Saun and eventually KU's office in charge of investigating Title IX complaints – the IOA. *Id.*, ¶37.

### 4. KU's Deliberate Indifference to Foreseeable Reprisal against Tackett.

Upon receiving Tackett's and McClure's reports about John Doe G, KU had the option to immediately suspend or ban him from campus while they conducted an investigation, or at minimum, issue what is known as a "no-contact" letter to John Doe G, telling him to not contact Tackett. *Id.*, ¶49. But KU deliberately chose not to do that immediately. *Id.*, ¶49.

Consequently, after making her report, John Doe G found Tackett in a low-traffic area of KU's campus and stared her down. *Id.*, ¶45. The experience frightened Tackett, and she reported the encounter to KU the same day. *Id.*, ¶46. Yet KU still took no immediate action to suspend, ban or tell John Doe G not to contact Tackett. *Id.*, ¶49-50. Consequently, later that same week, Tackett again encountered John Doe G on campus in front of the library, and the football player glared at her and called her a derogatory name. *Id.*, ¶47.

Only after demanding KU do something to stop John Doe G did KU decide to implement the bare minimum – and instruct John Doe G not to have contact with Tackett, months after she made her October 2015 report. *Id.*, ¶50.[1]

---

[1] *See* Defendant's ECF Doc. 25, Ex. 2, the no-contact letter, dated December 9, 2015. Plaintiff does not dispute the date. The letter shows that it came two months after KU had two independent reports that John Doe G was assaulting women on campus. It should have been issued in October, 2015, not after Tackett had to be intimidated twice by him on campus and send a letter demanding that KU take action.

KU delayed despite knowing the reprisal activity from John Doe G was likely. *Id.*, ¶112. By the time it acted, the damage was done. *Id.*, ¶52.[2]

### 5. Coach Catloth's Retaliation against Tackett and KU's Deliberate Indifference to it.

KU's rowing coaches were aware of Daisy's anxiety on campus following her report of her assault as well as the demands of the IOA investigation upon her time. *Id.*, ¶53. For instance, in order to make her first meeting with Title IX investigator in October of 2015, Tackett needed to miss a rowing practice. *Id.*, ¶38. She met with the assistant rowing coach and told her that she had been raped, had been experiencing stress that was worse now that she had reported the rape, and that asked if she could miss a practice to attend the IOA meeting. *Id.*, ¶39-40. The assistant coach told her she would have to ask Catloth, so Tackett informed Catloth as well that she needed to miss practice to meet with the IOA. *Id.*, ¶41-42. Catloth already knew she had been assaulted having learned that information from other coaches and rowers. *Id.*, ¶43.

Catloth did not want scrutiny drawn to his history of interactions with his female rowers, so he retaliated against Plaintiff and the other rower who had reported a sexual assault. *Id.*, ¶79. In early December, 2015, Catloth informed Tackett that she could not participate on a team training trip to Florida later that month. *Id.*, ¶55. Daisy told him what she had been battling and the details of her rape, and asked what she had to do to be able to go. *Id.*, ¶56. Catloth told her she had to pass a rowing  2k-test. *Id.*, ¶56. Tackett passed this test the very next day. *Id.*, ¶57.

But the next week, still in December, Catloth left Tackett and McClure off the list of rowers allowed to go on the trip. *Id.*, ¶58-59. Catloth knew Daisy Tackett had passed his test, but he left her off the list anyway, choosing instead to take rowers with slower times and less

---

[2] KU bizarrely suggests that Plaintiff has "flip-flopped" of the issue of whether KU issued a no-contact order. ECF Doc. 25, p. 9, FN 10.  Plaintiff has always maintained KU did issue a no-contact order, but did so two months too late, after the damage was already done. *See* Initial Petition, ¶89(b).

experience. *Id.*, ¶58, 60. Tackett met with him again, but he still would not bring her. *Id.*, ¶60.

At that point, Tackett asked the Coach for a letter that would allow her to transfer to another school if necessary because the rape, on-campus stalking and rowing team issues might force her to leave. *Id.*, ¶61. The Coach told her he would allow her to transfer, but not to any other team in the Big 12 conference. *Id.*, ¶62. KU officials knew of the Coach's action. *Id.*, ¶63.

Daisy Tackett's father contacted KU's Title IX investigations interim director and told him that Catloth was refusing to bring Daisy on the trip. *Id.*, ¶64. The interim director responded the next day stating that he knew Daisy was not currently being allowed to go on the trip, but that "Athletics makes those decisions and they are made without consideration of any pending IOA matters." *Id.*, ¶65. He only encouraged Daisy to continue a dialogue with Catloth. *Id.*, ¶65.

The very next day Tackett caused a four-page letter to be sent to KU's interim director of Title IX investigations that made clear that John Doe G's continued presence on campus was creating a hostile educational environment; that Catloth knew about her rape and participation in the Title IX investigation, but was blocking her from participating in team activities despite her complete qualification to do so; that he had told her to transfer out of KU, but would not give permission to transfer to a Big 12 school; that KU had not issued a "no-contact" order or banned John Doe G despite actual knowledge he had been intimidating her, and she wanted him banned; that she considered all of the preceding conduct to be retaliatory; and she wanted KU to educated Catloth "regarding the University's obligation to not retaliate against" her. *Id.*, ¶66.

KU's interim Title IX director condoned Catloth's conduct. *Id.*, ¶67. Caloth never allowed her to go on the trip, even though another spot opened up. *Id.*, ¶68. KU never banned John Doe G, allowing him to remain on campus and in the football program. *Id.*, ¶69.

After the winter break, Tackett returned to KU and attended one week of classes. *Id.*,¶73. KU still had not suspended John Doe G, expelled him or concluded its investigation. *Id.*, ¶74. She met with Catloth, who told her he excluded her from the trip because of her weight and missed workouts, including the day she missed to meet with KU's Title IX investigator. *Id.*, ¶75.

Tackett decided to withdraw from KU at that point. *Id.*, ¶76. Catloth told her she did not need to worry about returning equipment. *Id.*, ¶77. She met with KU's interim Title IX investigations director and again reported Catloth's retaliation. *Id.*, ¶78. He told her KU would allow her to withdraw without having to pay for the rest of the semester. *Id.*, ¶80.

Once at home in Florida, Tackett received an email sent at the direction of Catloth telling her to return the rowing equipment, which consisted of used spandex sweatpants, t-shirts and sports bras. *Id.*, ¶83. KU then sent her letter demanding that she pay her tuition or be subject to collections. *Id.*, ¶84. KU then placed an administrative hold on her transcripts. *Id.*, ¶85.

### 6.   KU's Deliberately Indifferent Misrepresentations and Unreasonable Process[3]

KU's Title IX investigators sent her a letter stating that it had reached the conclusion that John Doe G should be "permanently expelled." ECF Doc. 28, Ex. 1, ¶91. On March 16, 2016, KU Students Affairs administrators represented that John Doe G would agree to an immediate expulsion to avoid a hearing. ECF Doc.28, Ex. 1, ¶92. Tackett agreed to this proposal. ECF Doc. 28, Ex. 1, ¶93. On March 18, 2015, KU administrators then sent her a letter stating that John Doe G "has been effectively permanently expelled" and "was withdrawn from the University effective March 17, 2016." ECF Doc. 28, Ex. 1, ¶94. KU represented its decision "achieves everything that would have been sought during the formal hearing…" ECF Doc. 28, Ex. 1, ¶96. KU engaged in a similar series of representations with McClure. ECF Doc. 28, Ex. 1, ¶99.

---

[3] These additional facts were discovered when media reports surfaced after September 9, 2016, that KU had communicated to John Doe G that he was being allowed to withdraw in lieu of expulsion. The new facts are alleged in Plaintiff's proposed Second Amended Petition, ECF Doc. 28, Ex.1.

But KU communicated to John Doe G something much different. ECF Doc. 28, Ex. 1, ¶97. KU told John Doe G that he was being allowed to "withdraw in lieu of expulsion." ECF Doc. 28, Ex. 1, ¶97. John Doe G then enrolled in Indiana State University and joined their football team, following a KU coach to that team. ECF Doc. 28, Ex. 1, ¶98.

**C.    Questions presented.**

1. Whether KU's Motion relies on facts, evidence, negative inferences and denials that are beyond the pleadings.

2. Whether plaintiff pled facts that, construed in her favor, plausibly state a Title IX Hostile Educational Environment claim under Tenth Circuit precedent.

3. Whether plaintiff pled facts that, construed in her favor, plausibly state a Title IX Retaliation claim under Tenth Circuit precedent.

**D.    Argument**

**I.    Standard for Motion**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all the factual allegations in the complaint" and "construe them in a light most favorable to the plaintiff" and "resolve all reasonable inferences in plaintiff's favor." *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996). "Dismissal is inappropriate under Fed. R. Civ. P. 12(b)(6) unless the plaintiff can prove no set of facts in support of his claims to entitle him to relief." *Id.*

Fed.R.Civ.P. 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." The Court considers whether Plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."*Id.* Pleading requirements in

discrimination cases are more lenient. *See Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).

**II.     KU's Motion relies on facts, evidence, negative inferences and denials that are beyond the pleadings, and should be excluded.**

KU's Motion to Dismiss purports to present a Rule 12(b)(6) motion attacking the

sufficiency of Plaintiff's pleadings. However, KU's motion relies on at least **20 references to**

**external evidence, negative inferences or denials of pleaded fact.**[4] This speaks to the need for

discovery to occur in this case. Rule 12(d) states that if a party presents matters outside the

pleadings on a Rule 12(b)(6) motion, the Court should disregard it or else treat the motion as

Rule 56 summary judgment motion. KU has not even filed an Answer in this case, much less

---

[4] **1.** ECF Doc. 25, p.2, FN1 (Reference to four exhibits attached to motion KU selects in belief it helps its case, to the exclusion of other documents.); **2.** *Id.*, p.4, FN2(link to KU's reported crime stats it keeps separate from its housing web sites); **3.** *Id.*, p.5 (link to KU's website regarding purported disciplinary actions with no showing as to how they relate to the present suit); **4.** *Id.*, p.6, FN4 (averment of irrelevant fact that Daisy Tackett lived in a private dorm herself when she was raped in the Jayhawker Towers – KU, one would hope, would try to keep its students safe at its dorms, even if they reside elsewhere); **5.** *Id.*, p.6, FN5 (denial of fact pleaded in the First Amended Complaint, although KU has chosen not to file an Answer); **6.** *Id.*, p.9, FN9 (referencing Ex. 2, and suggesting it should be considered because it is "central to the complaint."); **7.** *Id.*, p. 9, FN 11 (link to KU calendars); **8.** *Id.*, p.9, FN11 (reliance of matters outside of the pleadings to argue that because there were holidays, KU should be forgiven for exceeded Dept. of Ed. guidelines by two months. Simply because there was a winter break does not explain why KU administrators could not get the job done, for instance, by making a phone call to a student, etc.); **9.** *Id.*, p.12, FN14 (referencing a letter to Ms. Tackett from KU, attached to its motion as Exhibit 3, which actually shows KU reneging on its promises); **10.** *Id.*, p.13 (Without filing an Answer, KU denies pleaded facts that KU had policies of encouraging rowers to attend football games; Plaintiff has evidence to the contrary); **11.** *Id.*, p.13(Without filing an Answer, KU relies on a denial that it had a policy of entertaining football recruits off-campus using female athletes – but Plaintiff has information that KU does); **12.** *Id.*, p.14 (Reference to an exhibit containing a "no-contact" letter KU sent to its football player two months two late AFTER Ms. Tackett had to demand it and undergo on-campus intimidation twice); **13.** *Id.*, p.16 (suggestion that KU was unable to carry out its Title IX obligations during "Thanksgiving and long winter break when students are away" – a fact that is not pleaded, and likely not true);**14.** *Id.*, p. 21 (suggesting that Plaintiff only experienced two "brief visual encounters" – but that is not the fact that was pleaded); **15.** *Id.*, p. 24, FN 2 (arguing that "evidence at summary judgment would show" that the KU football player threatened KU with litigation, and therefore KU had no choice but to violate Ms. Tackett's Title IX rights or else get sued – this is not a pleaded fact and Plaintiff does not agree that it happened, but agrees that the parties should conduct discovery); **16.** *Id.*, p. 25(relying on an averment that Coach Catloth denies making a racial comment about – though he apparently does not deny calling his female rowers "fat." ) ; **17.** *Id.*, p. 25, FN 21(reference to a website that talks about rowing strategies, as a justification for Coach Catloth's comments on the physical appearance of his rowers, over their objections – Plaintiff anticipates producing witness testimony on the subject); **18.** *Id.*, p. 27(drawing inference that Coach Catloth stopped calling his rowers fat, even though this was not pleaded); **19.** *Id.*, p. 28(attributing Plaintiff's averment that Coach Catloth knew she had reported a sexual assault to "her own self-serving speculation" – this was not pleaded, and witness credibility for KU to determine); **20.** *Id.*, p. 35(suggesting KU's Coach did not retaliate against Plaintiff when he refused to allow her to transfer to another Big 12 school because "the coach did not want to arm his primary competition with a rower he spent three semesters raining…").

offered Rule 26(a) disclosures or answered discovery. Plaintiff requests that the Court disregard KU's 20 references, deny the motion, and permit Plaintiff the opportunity to conduct discovery before responding to any properly filed Rule 56 motion KU might choose to file.

### III. Plaintiff Pled Facts that, Construed in her Favor, Plausibly State a Title IX Hostile Educational Environment Claim under Tenth Circuit precedent.

#### a. *Simpson* liability for her rape.

If KU had acted right and ended a policy it knew put young women at risk at being raped at Jayhawker Towers, Daisy Tackett would likely have been able to enjoy a normal college experience. These are the elements of a Hostile Educational Environment claim according to *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007): KU is liable if it is (1) a "funding recipient" and (2) possesses an "official policy" of "deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Id.* at 1178; *See also C.T. v. Liberal School Dist.*, 562 F.Supp.2d 1324, 1338-39 (D.Kan. 2008)(summarizing *Simpson*); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).[5] Notably, KU, now having two opportunities to brief this issue, fails to do so.  Plaintiff has adequately pled liability under *Simpson*.

The plaintiffs in *Simpson* were sexually assaulted by football players and high school football recruits visiting the university's football program. Plaintiffs claimed, under Title IX, that the university knew of the risk of sexual harassment of female students in connection with the football recruiting program and that it failed to take any action to prevent further harassment before their assaults. *Id.* at 1174. The court held that summary judgment was erroneously granted for the university where facts showed its officials had knowledge of prior rapes and harassment

---

[5] Plaintiff previously briefed the Title IX framework that gives rise to private cause of action for Hostile Educational Environment, and hereby incorporates that discussion contained in ECF Doc. 16, p. 2-3.

in the context of the recruiting program, **even though those prior acts were not committed against the same plaintiffs or by the same perpetrators**. In so doing, the Tenth Circuit distinguished the claims at issue in *Gebser v. Labo Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) and *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629 (1999) from the claims at issue in *Simpson,* as follows:

> **We find it significant that in those cases there was no element of encouragement of the misconduct by the school district.** To be sure, in those cases the school district could anticipate that the very operation of a school would be accompanied by sexual harassment, but that is simply because, unfortunately, some flawed humans will engage in such misconduct when they are in the company of others. Here, however, the gist of the complaint is that CU sanctioned, supported, even funded, a program (showing recruits a "good time") that, without proper control, would encourage young men to engage in opprobrious acts. **We do not think that the notice standards established for sexual-harassment claims in *Gebser* and *Davis* necessarily apply in this circumstance.**

*Simpson* at 1177 (emphasis added).

   *Simpson* recognized that "[i]mplementation of an official policy can certainly be a circumstance in which the recipient exercises significant 'control over the harasser and the environment in which the harassment occurs.'" *Id.* at 1178 (*quoting Davis,* 526 U.S. at 644). A funding recipient may be liable under Title IX when a violation is caused by a "policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Simpson*  at 1178. Even

   A recent federal district court denied a university's motion to dismiss a *Simpson*-based Title IX claim in *Tubbs v. Stony Brook University*, No. 15 Civ. 0517 (S.D.N.Y. 2016). There, plaintiff alleged her university was deliberately indifferent in responding to prior sexual assaults, "thus signaling to the campus community that sexual misconduct is not seriously addressed and leaving students liable or vulnerable to such misconduct on campus." *Id.* The university's

knowledge of a pre-existing increase of campus sexual assaults, combined with the university's "official policy" of failing to adequately respond to on-campus sexual violence or remedy deficiencies, satisfied the deliberate indifference standard imposed by Title IX.

Similarly, in *Doe v. The University of Tennessee,* Case No. 3:16-cv-00199 (M.D.Tenn. May 3, 2016), the federal district court denied a motion to dismiss, holding the plaintiffs had adequately pled *Simpson* liability with far more general allegations than what Tackett and McClure offer this Court:

> that UT was put on notice of a specific and concrete pattern of an "inordinate" number of sexual assault allegations against members of specific teams within the UT Athletic Department and also allege that such a pattern may be directly related to the culture within the Athletic Department. In fact, the entire FAC is precisely structured around the theory that liability stems from UT's failure to acknowledge and address the acute risks to female students by a certain segment of its student body that are well above and beyond the general risks of student-on-student harassment.

In this case, Plaintiff has pled that KU specifically knew of an entrenched, current problem of sexual assaults at its athletic dorm, and despite this clear knowledge, decided to continue its official policy of placing football players there where they would receive *less supervision*.

The important point to remember under a *Simpson* theory is that Tackett does not need to prove that KU knew John Doe G had assaulted other women before he got to her. *Simpson,* 500 F.3d at 1177 ("notice" requirement under *Gebser* not required). S*ee also e.g. Doe v. University of Tennessee*, *supra,* (holding that a university may be held liable under Title IX and *Simpson* for its conduct prior to the sexual assault even occurring, if the university possessed policies that rendered the plaintiff vulnerable to an assault). Tellingly, the bulk of KU's argument for dismissal relies exclusively on cases applying a *Gebser* and *Davis* theory of liability, where the university must have actual notice that a specific football player presents a risk to the plaintiff. *See* ECF Doc. 25, p.17-20. But Tackett seeks to hold KU accountable for her rape on a *Simpson*

theory, which does not require such notice, but rather the existence of policies the university knows will foster the assaults that occur.

In this case, Tackett has pled facts substantiating Title IX liability under *Simpson*:

- KU is a federal funding recipient. ECF Doc.22, ¶4.

- KU possessed an official "policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Simpson* at 1178.

Tackett pled that KU knew that its Jayhawker Towers apartments had a specific history of sexual assaults against women, providing specific examples only from 2013 forward. ECF Doc. 22, ¶11. KU's own reporting shows that reported sexual assaults in its dorms has been trending up in recent years. *Id.*, ¶15. In 2014, KU's chairwoman of a taskforce on the sexual assault problem stated publicly that the reported assaults greatly under-represent the true number of assaults occurring at KU: for every one reported, eight go unreported. *Id.*, ¶12. KU's own police chief for 38 years has stated in January of 2016that sexual assaults remained the largest issue for the campus. *Id.*, ¶15. Therefore, KU clearly had actual knowledge that sexual assaults were occurring at a high rate at Jayhawker Towers. *Id.*, ¶87.

Despite this brutal knowledge, KU continued to represent its dorms, including Jayhawker Towers, as "safe." *Id.*, ¶16. It failed to actually implement the reforms its own task force on its sexual assaults recommended. *Id.*, ¶13. Most importantly, it continued – and to this day continues – to enact "an official policy of placing KU athletes, in particular KU football players, in KU's Jayhawker Towers Apartments, where they would receive less supervision than other residence hall options." *Id.*, ¶86.[6] Plaintiff has pled that KU "failed to provide adequate

---

[6] This motion should be about the pleading. However, publically available information corroborates that KU knows athletes receive less supervision at Jayhawker Towers: *See*  https://housing.ku.edu/jayhawker-towers ("'The Towers' offers students … increased space, privacy, **and independence** while retaining the advantages of on-campus living such as location, staff, security, programs, and activities.)

supervision, warnings, training, guidance and education to its athletes and KU football players in particular at Jayhawker Towers." *Id.*, ¶88.

KU clearly, unquestionably, knew it had a long-standing problem with sexual assaults at Jayhawker Towers. Yet it continued to enact a policy of placing football players there so that they would be able enjoy *less supervision*. KU's policy provided this perk to football players knowing its price would be paid in the safety of its female students. *Id.*, ¶89, 97(a)-(b). The likelihood of misconduct had been obvious for some time; KU's decision to continue packing football players into a dorm with less supervision constitutes deliberate indifference to the fate of Tackett, and others. *Id.*, ¶89.

These pleadings must be taken as true, and not just because that is the rule – the pleadings are based on publically available information. These allegations establish KU's *Simpson* liability for the rape Tackett suffered because KU deliberately continued a policy of providing less supervision to football players in a dorm it knew had an entrenched epidemic of sexual assaults.

That policy is, perhaps, most responsible for her rape. But it was not KU's only deliberately indifferent policy. Plaintiff has also pleaded that KU had official policies of forcing female athletes in subservient roles to KU football players before the football players ever even enrolled. KU had a policy of entertaining football recruits off-campus at parties with female KU athletes. ECF Doc. 22, ¶72. KU also had a policy of pressuring KU rowers to cheer on football players at their games. *Id.*, ¶70-71. These policies subordinated female athletes to football players before they even set foot in the Jayhawker Towers.

Plaintiff therefore has stated sufficient facts to show she has a plausible claim under *Simpson*. KU offers this Court no analysis that would justify dismissal of her claim in light of *Simpson*. KU refers the Court to matters outside the pleadings, and perhaps denies that some of

Plaintiff's allegations are true, but these are not arguments that can prevail on Rule 12(b)(6) motion. If the Court inclined to consider matters outside the record, then Plaintiff requests leave to conduct discover in order to have a reasonable opportunity to respond to KU's denial of Plaintiff's well-pleaded facts.

### b. *Murrell* and *Escue* liability for Harassment

Apart from the *Simpson* liability for its dangerous policies, Plaintiff has also pled facts that show plausible claims under *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1246 (10th Cir. 1999), which defines the elements a plaintiff must show to establish a Title IX claim for sexual harassment based on the more typical fact pattern where a University knows that harassment is happening but remains deliberately indifferent to it.

To state a claim under Title IX for student-on-student sexual harassment, a plaintiff must show that the school "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it … deprived the victim of access to the educational benefits or opportunities provided by the school." *Murrell,* 186 F.3d at 1246.  In *Escue v. N. Okla. Coll.,* 450 F.3d 1146 (10th Cir. 2006), the Tenth Circuit articulated the three elements in a comparable manner:

> (1). . . the [school] remains deliberately indifferent to acts of harassment of which it has actual knowledge, (2) the harassment was reported to an appropriate person . . . with the authority to take corrective action to end the discrimination, and (3) the harassment was so severe, pervasive and objectively offensive that it. . . deprived the victim of access to the educational benefits or opportunities provided by the school.

*Ross v. University of Tulsa*, Case No. 14-CV-484-TCK-PJC (N.D. Okla., April 15, 2016) (*quoting Escue,* 450 F.3d at 1152 (citations omitted)). Under any formulation of the elements, however, Plaintiff has pled more than sufficient facts to show she has plausible claims for what

her rowing Coach did to her and how KU failed to protect her or respond in a fundamentally fair way to her reports. Plaintiff will address the *Escue* formulation for the Court's benefit.

### Element #1: KU's Deliberate indifference to known harassment.

To have exhibited "deliberate indifference" to these known acts of harassment, KU must have acted in a clearly unreasonable manner. *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 646-647 (1999). A response is "clearly unreasonable" when it is not calculated to be effective, or when repeated harassment demonstrates that it has not been effective. *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000); OCR Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12034 (Mar. 13, 1997)("the "OCR Guidelines"). Title IX "does not require specific responses [but] it does require a reasonable response once a school receives actual notice of a substantial risk." *Id.* A response is also "clearly unreasonable" where the response makes the student more vulnerable to harassment. *Davis,* 526 U.S. at 645. A "minimalist response is not within the contemplation of a reasonable response." *Escue*, 450 F.3d at 1155 (citing *Vance*, 231 F.3d at 260); s*ee also BPS v. Board of Trustees For Colorado School for The Deaf and Blind*, 12-cv-02664-RM-KLM (D.Colo. September 16, 2015). Deliberate indifference prior to a sexual assault that makes a student more vulnerable to an attack, or deliberate indifference after a sexual assault that results in additional harassment, is actionable. *Ross v. Corp. of Mercer Univ.*, 506 F.Supp.2d 1325, 1346 (M.D. Ga. 2007). Deliberate indifference "will often be a fact-based question, for which bright line rules are ill-suited." *Doe ex rel. Doe v. Derby Bd. Of Educ.*, 451 F.Supp.2d 438, 447 (D.Conn. 2006).

Daisy Tackett pled facts that show KU was deliberately indifferent to her sexual harassment and took action to make her vulnerable to more. KU exhibited deliberate indifference

to these known acts of on-campus intimidation and harassment in the following four ways:

**(1) Failing to suspend, ban or even issue a "no-contact" directive in October, 2015, when it first received two separate reports that John Doe G had assaulted women, and waiting till December, after Plaintiff had twice experienced and reported additional harassment and had to demand KU to protect her, to send just a "no-contact" order.** ECF Doc. 22, ¶48, 50, 97(c)-(d). Where a rape victim requested a university to move her attacker to a different housing facility, the university's two-week delay was sufficient to establish "deliberate indifference" sufficient to deny summary judgment. *Ross v. Corporation of Mercer University*, 506 F.Supp.2d 1325, 1357 (M.D. Georgia 2007).

In *Kelly v. Yale Univ*., No. 3:01-CV-1591, 2003 WL 1563424, at *1 (D. Conn. Mar. 26, 2003), a college student sexually assaulted by a fellow student claimed Yale was deliberately indifferent in failing to timely protect her with academic and housing accommodations that would separate her attacker from her. The district court denied summary judgment, holding that the university failure to take immediate action to protect the student created a fact issue on deliberate indifference under *Davis,* 526 U.S. at 645, because Yale's inaction made her more "vulnerable" to further harassment: "Although [the plaintiff] was not subjected to further harassment by [the assailant], it was … not any immediate action taken by Yale … that assured that outcome" and "[t]herefore, a reasonable jury could find that Yale's response, or lack thereof, rendered [the plaintiff] 'liable or vulnerable' to [the assailant's] harassment." *Id. See also Doe ex rel. Doe v. Derby Bd. Of Educ.*, 451 F.Supp.2d 438, 448 (D.Conn. 2006)(finding fact issue on deliberate indifference where school made no effort to reduce the victim's "vulnerability to traumatic interactions with her attacker" where they attended school at the same building and she suffered several episodes of harassment by his friends.)

Most on point may be the recent decision in *Takla v. Regents of the University of California*, 2015 WL 6755190 (C.D. Cal. Nov. 2, 2015), where plaintiff alleged, despite reporting her attacker to the university, it took no formal action against him, and that her attacker then "followed" and "started at" her on two occasions on campus. The District Court held that under *Davis,* the "deliberate indifference" must be determined based on whether a school's conduct "makes [plaintiffs] liable or vulnerable" to further harassment," 526 U.S. at 645, and that the university had a "responsibility to take reasonable measures to end the harassment" whether or not any additional harassment actually occurred.

In this case, Plaintiff pled that KU knew John Doe G was likely to retaliate against her following her report (ECF Doc. 22, ¶52), a fact corroborated by the 2011 Dear Colleague Letter, attached as Exhibit 1. However, instead of taking immediate action to protect Tackett, KU waited two months to deploy the bare minimum of protection – a letter to John Doe G instructing him to have no-contact with Tackett. But this letter did not go out until she had been harassed on campus twice and after she specifically demanded the relief in formal letter to KU. KU's two months of inaction caused her to be vulnerable to John Doe G's harassment, which KU now seeks to minimize in its motion. Under *Davis*, she has sufficiently pled deliberate indifference.

KU argues that John Doe G did not harass Tackett after KU finally issued its no-contact order, and therefore KU should be absolved for its delay. However, in the Tenth Circuit, the "fact that [plaintiff] was not harassed after leaving the school does not entitle the district to summary judgment….[I]t was 'not *necessary*…to show physical exclusion to demonstrate that students have been deprived [of their rights]." *Rost ex rel. KC v. Steamboat Springs RE-2 School*, 511 F.3d 1114, 1132 (10th Cir. 2008).

(2) **Taking five months to complete a simple investigation.** *Id.*,¶90. A "lengthy and unjustified delay" in implementing remedial action can establish "deliberate indifference." *Hayut v. State University of New York*, 352 F.3d 733, 751 (2d Cir. 2003); *See Davis*, 526 U.S. at 649 (failure to respond to complaints from plaintiff and other students for five months could establish "deliberate indifference"). KU is aware that in 2011, the Education Department stated that "a typical investigation takes approximately 60 calendar days following receipt of the complaint."[7]

In a recent case, a young woman at the University of Kentucky reported being raped in her dorm room in October 2, 2014. *Doe v. University of Kentucky*, No. 5:15-cv-00296-JMH (E.D. Kentucky, August 31, 2016). The next day, the university issued a "no contact order" to her attacker, immediately suspended him, and scheduled a hearing for him on October 8, a mere six days after the alleged rape. The alleged attacker appealed the university's finding against him twice, and the university held three more hearings by March 26, 2015.[8] The district court denied the motion to dismiss, finding that while the University did not display "deliberate indifference" because it immediately issued a no-contact order, immediately suspended the accused, held its first hearing just six days after the report, and thereafter held three more hearings and appeals in the next several months. But, the Court noted the delay "profoundly affected Plaintiff's ability to obtain an education, and then held that the University ongoing failure to resolve the matter **did** amount to "deliberate indifference."

By comparison, in the present case, KU never suspended John Doe G, took two months to issue a "no contact" order, and took nearly five months to schedule its first hearing in the case. This delay in taking meaningful action amounts to deliberate indifference.

---

[7] Ex. 1, April 4, 2011 Ed. Dept. Dear Colleague Letter, p. 12.
[8] The students' winter break at the University of Kentucky does not have appeared to have hindered that school's ability to conduct three timely Title IX hearings.

**(3)   Refusal to investigate or remedy Catloth's harassment and retaliation.** *ECF Doc.22, ¶55-78.* One of the most basic forms of Title IX liability is established when school does nothing to investigate reports of harassment. *Morse v. Regents of University of Colorado*, 154 F.3d 1124, 1128 (10th Cir. 1998)(failure to take "any remedial action" with regard to report of sexual harassment is actionable under Title IX); *See also Murrell,* 186 F.3d at 1243-1248; (holding failure to investigate amounted to deliberate indifference); *Vance*, 231 F.3d at 262 (failure to investigate one of several incidents of reported harassment reflected "deliberate indifference"); *Jones v. Indiana Area School Dist.*, 397 F.Supp.2d 628, 645 (W.D. Penn. 2005)(failure to investigate complaint to Title IX coordinator evidence of deliberate indifference); *Ross v. Corporation of Mercer University*, 506 F.Supp.2d 1325, 1357 (M.D. Georgia 2007)(failure to investigate a Title IX complaint, even if university claimed student did not fill out the paperwork for the complaint, was sufficient evidence of deliberate indifference to require a jury trial).

Tackett has pled that KU's Title IX coordinator for two years ignored complaints about Catloth's behavior and his "fat" commentary, and that the same coordinator refused to enforce a medical policy actually designed to stop Catloth from engaging in this behavior. When Tackett also complained about this behavior in October of 2015 to the Title IX coordinator, Catloth excluded her from rowing team activities less than two months later and provided no believable reason for doing so – Tackett passed all of the tests and was more qualified than other rowers allowed to participate. KU simply refused to conduct any investigation at all into Tackett's complaints and those of other rowers. ECF Doc. 22, ¶97(g),(i).

Tackett has further pled that she specifically reported Catloth's subsequent retaliatory conduct to KU, and that KU did not investigate or attempt to remedy the situation. Tackett and

her father specifically identified Catloth's refusal to take her on the training trip as retaliatory to KU's Title IX investigator. *Id.*, ¶64, 66. Yet the investigator took no action. ¶97(g),(i). The investigator actually told Plaintiff to just talk to her coach. *Id.*, ¶65. That cannot be, under any stretch of the imagination, a sufficient response under Title IX to a report of retaliation.

**(4) Misleading Tackett as to the result of KU's Title IX process against John Doe G.** ECF Doc. 28, Ex.1, ¶91-111. KU deliberately chose to mislead Tackett regarding the outcome of its decision, leading her to believe that John Doe G was being expelled from KU with a notation on his transcript that would alert other schools to what he had done.  KU, in fact, communicated to John Doe G that he was being allowed to "withdraw" in lieu of expulsion, and John Doe G was then able to join another university's football team where a KU football coach had gone to work. KU did this because it was more concerned with avoiding a lawsuit from John Doe G than it was with Tackett's Title IX rights.  KU takes concedes this. ECF Doc. 25, p.24, FN20. As a result, Tackett never received a hearing.

In *Ross v. University of Tulsa*, Case No. 14-CV-484-TCK-PJC (N.D. Okla., April 15, 2016), the federal district court observed that "[i]ntentionally biased student conduct proceedings, or clearly unreasonable methods of handling student reports of sexual violence, seem to fit within the parameter of Title IX 'deliberate indifference' as outlined in *Gebser* and *Davis*." Moreover, in the Tenth Circuit's *Murrell* decision, it held that the plaintiff's averment that school administrators responded to known acts of sexual harassment with concealment "plainly amounts to deliberate indifference." *Murrell*, 186 F.3d at 1248; s*ee also  TE v. Grindle*, 599 F.3d 583 (7th Cir. 2010)(principal's misleading statements would allow a jury to infer intention to discriminate against female students).

Plaintiff pled facts that show KU officials intended to discriminate her during the Title IX

process – that is the inference to be drawn from the university's active effort to mislead her regarding her case's outcome. This is not mere laziness or ineptitude, as KU may claim, but a calculated strategy to fool Plaintiff during the Title IX process. This is deliberate indifference.

**Element 2: Tackett's harassment was reported to a person with authority to stop it.**

Tackett has pled that she reported her rape in October 2015 to many KU officials, including Van Saun, the Title IX compliance officer and KU's "IOA" department, which is tasked with investigating Title IX complaints. ECF Doc. 22, ¶37. This shows that KU officials, with the ability to stop the harassment, had actual knowledge of her rape.

Plaintiff has further pled that KU officials to whom she reported her rape had actual knowledge that reprisal from John Doe G was likely. *Id.*, ¶112.[9]

Plaintiff also pled that she reported John Doe G's two acts of intimidation to KU's Title IX investigator, and then sent a formal letter to the same Title IX investigator demanding KU take action. *Id.*,¶45-47. Therefore, a KU official with authority to stop John Doe G also had actual knowledge that John Doe G was retaliating against Tackett on its campus. *Id.*, ¶66.

Plaintiff also pled she reported Catloth's harassment to Van Saun, the Title IX compliance officer, and that she further reported Catloth's retaliation to KU's Title IX investigator and interim IOA director on three occasions – through her father's meeting with the Title IX investigator, her own meeting with him, and through a formal letter to the investigator reporting the conduct and requesting that he put a stop to it. *Id.*, ¶¶ 64, 66, 78.

Finally, KU's misrepresentations during the Title IX process were authored by two high-level KU officials who actually served as KU's Title IX decision-makers in this case. ECF Doc.

---

[9] The 2011 Dear Colleague Letter, if nothing else, put KU on notice that reprisal activity could be anticipated: "Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting." Ex. 1, April 4, 2011 Ed. Dept. Dear Colleague Letter, p. 16.

28, Ex. 1. Where the school itself acted improperly, it is liable under Title IX. *Murrell*, 185 F.3d at 1246. A university's decision is an "affirmative institutional decision" and therefore there is no need to show that it knew what it was doing. A university's decision is "always – by definition – intentional." *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 967-68 (9th Cir. 2010)(citing *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 183 (2005)).

**Element 3: Tackett's rape, harassment, retaliation and defrauding deprived her of access to KU's educational benefits and opportunities.**

There is no question that Tackett's rape deprived her of educational benefits and opportunities. "A single act of severe sexual harassment—particularly a rape .... can support a Title IX claim where the claim is premised upon the school's response to the report of the incident of sexual harassment." *Spencer v. University of New Mexico Board of Regents*, No. 15-CV-141 MCA/SCY (January 11, 2016)(*citing Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259, n.4 (6th Cir. 2000) and *S.S. v. Alexander*, 177 P.3d 724, 739 (Wash. Ct. App. 2008)).

Second, harassment "of any sort" that follows a sexual assault creates a jury fact on whether an educational environment was so hostile that it would deprive a victim of educational opportunity. "[A] reasonable jury [may] conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university." *Id.,* (*quoting Kelly v. Yale Univ.,* No. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. 2003)).*"A jury may conclude that harassment is severe, pervasive, and objectively offensive from evidence that a student who is known to have perpetrated a sexual assault upon another student is permitted to continue attending the same school as the victim, leaving open the potential for interactions between the two." *Id.* (*citing  Doe v. Derby Bd. of Educ.,* 451 F.Supp.2d at 444). Due to KU's

inaction, Tackett had two run-ins with her attacker on campus and continuously altered her daily activities to avoid him. This, in and of itself, deprived her of educational opportunities.

Third, Catloth's ongoing gender-based harassment regarding his rower's weight and physical appearance can also establish a hostile educational environment. "Discrimination under Title IX includes coach-on-student sexual harassment that creates a hostile environment in a school sports program." *Jennings v. University of North Carolina*, 482 F.3d 686, 694 (4th Cir. 2007). Whether gender-oriented harassment is severe or pervasive "depends on a constellation of surrounding circumstances" including whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it deprived the student of educational opportunities or benefits. *Id.*(*citing Davis*, 526 at 650-1.) "Evidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances." *Id.* Vulgar comments about body weight directed predominantly at female employees can constitute sexual harassment. *Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269-70 (8th Cir. 1993); *Jennings*, 482 F.3d at 695. In this case, Catloth's comments were not predominantly about women under his supervision – they were entirely about women under his supervision. Moreover, his relative age and position of power militate in favor of finding his commentary severe enough to create a hostile educational environment. *Jennings*, at 698-99. Tackett has pled facts that show her experience with Catloth's comments and conduct "so undermine[d] and detract[ed] from [her] educational experience" as to "effectively den[y her] equal access to an institution's resources and opportunities." *Id.* (*quoting Davis*, 526 U.S. at 654).

She further pled facts that showed the harassment she suffered from KU's football player and her rowing team coaches *actually did deprive her of educational opportunities.* After reporting her rape, and after KU's failure to protect her from the KU football player, Tackett's

panic attacks during practices at KU's football facility worsened. ECF Doc.22, ¶46, 52. She began to withdraw from campus life, avoiding facilities and dining halls where she might encounter the KU football player and his friends. *Id.* ¶ 52. Her rowing coaches refused to permit her to participate in team activities, despite passing extra testing Catloth made her perform. *Id.* ¶56-63. Ultimately, Tackett had to withdraw from KU after KU's investigation into her complaint dragged out. *Id.* ¶90.56. These pleaded facts show that KU's conduct deliberately denied her access to KU's campus, education and programming.

Finally, KU's misrepresentations during the Title IX process were designed to save KU from being sued by John Doe G, not to provide Tackett with access to legitimate redress. KU lured Tackett into believing that John Doe G had been expelled, depriving her of a hearing, or an appeal, or the opportunity to press for an expulsion, or the chance to have a hearing. KU's acts had a "concrete negative effect on" Tackett's ability to participate in an educational program or activity – which under *Davis*, satisfies this *Escue* element. *Jennings*, 482 F.3d at 699(*quoting Davis*, 526 U.S. at 650-51, 654).

**Summary:** Tackett has pled facts establishing *Simpson* liability for her rape and *Escue* liability for the subsequent on-campus harassment by John Doe G, KU's delay in providing a hearing, KU's failure to stop or investigate Catloth's retaliation and harassment, and KU's own deliberate misrepresentations during the Title IX process.  KU's motion to dismiss should be denied.

IV.     **Plaintiff pled facts that, construed in her favor, plausibly state a Title IX Retaliation claim under Tenth Circuit precedent.**

The Supreme Court recognized a cause of action for Title IX retaliation in *Jackson v. Birmingham Bd. of Ed.*, 544 US 167 (2005). There, the Court stated Title IX is a "broadly written general prohibition on discrimination…" *Jackson*, 544 U.S at 175.

The Tenth Circuit applies the Title VII framework to Title IX retaliation claims. *Gossett v. Okla. ex rel. Bd. Of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001)(Courts generally assess Title IX discrimination claims under the same legal analysis as Title VII claims); *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724-25 (9th Cir. 2012)(Title IX retaliation claims analyzed using Title VII framework). Under Title VII, the elements of a retaliation claim are: (1) the employee "engaged in a protected opposition to discrimination"; (2) the employee suffered an adverse action during or after his opposition, which a reasonable employee would have found to be materially adverse (meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"); and (3) there was a "causal connection . . . between the protected activity and the materially adverse action." *Miller v. BNSF Railway Company*, Case No. 14-2596-JAR-TJJ (D.Kan. May 17, 2016)(citing *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 & n.4 (10th Cir. 2007)).

In this case, Tackett pled facts that establish all three elements for a prima facie case of retaliation.

### (1) Pled facts show Tackett engaged in protected activity.

"Title IX empowers a woman student to complain, without fear of retaliation, that the educational establishment treats women unequally." *Emeldi* 698 F.3d at 725. 34 C.F.R. §100.7(e) states:

> (e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. ….

In this matter, Tackett engaged in several forms of protected activity, including reporting her rape, reporting John Doe's reprisal activity, reporting Catloth's harassment and protesting

28

Catloth's conduct to Van Saun, and reporting Catloth's retaliation. ECF Doc.22, ¶31, 36, 37. Her reports were formal, but even informal reports to superiors constitute protected activity. *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). Tackett pled facts that show numerous incidents of protected activity.

### (2) Pled facts show Tackett suffered an adverse action.

Under Title IX, a materially adverse action in a retaliation setting includes any action that might "dissuade[] a reasonable worker from making or supporting a charge of discrimination…." *Somoza v. University of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008)(quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). The Tenth Circuit construes the term "adverse action" liberally. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir 2013).

In this case, Tackett pled facts showing that KU officials took these adverse actions after her protected activity: (a) Catloth blocked her from participating in team activities. Tackett reported it to the interim director of Title IX investigations three times, and he did nothing to investigate or remediate; (b) KU made misrepresentations to Tackett prior to the hearing-that-did-not-happen that concealed the fact they were letting John Doe G withdraw from the school. KU decision-makers were aware of their misrepresentations; (c) KU sent, or could not stop itself from sending, letters demanding that she pay tuition and return rowing gear that KU had told her she did not have to pay or return; (d) KU placed holds on her records. ECF Doc. 22, ¶109.

### (3) Pled facts show causal connection between protected activity and adverse action.

A causal connection can be established by showing proximity between the protected activity and the adverse action. *Conroy v. Vilsack*, 707 F.3d 1163, 1182 (10th Cir. 2013)(noting that where less than six weeks separate protected activity and an adverse action, "temporal proximity alone will be sufficient to establish the requisite protected activity."). In this case,

29

Tackett pled facts showing that her protected activity and KU's adverse actions "occurred within days of one another." ECF Doc. 22, ¶110(a).

Failure to conduct a competent investigation is also evidence of a causal connection. *Zisumbo v. Ogden Regional Medical Center*, 801 F.3d 1185, 1201 (10th Cir. 2015). In this case, plaintiff pled that KU refused to investigate her reports that Catloth retaliated against her, and that he was making "fat" comments about his female rowers. ECF Doc. 22, ¶¶ 64-67, 110(d).

A pattern of discrimination occurring soon after a protected activity can also establish a causal connection. *Marx v. Schuck Mkts. Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). Tackett pled that Catloth, immediately and contemporaneous with Tackett's protected activities, began engaging in a pattern of discrimination designed to exclude her from the rowing team. ECF Doc. 22, ¶¶ 53-68. Catloth told Tackett one of the reasons he excluded from the team trip was that she missed a training day in order to meet with a Title IX investigator. *Id.*, ¶75. In addition, Tackett pled facts showing that KU's supposed reason for excluding her from the rowing team activities was pretextual. She objectively met Catloth's stated requirements when she passed the time trial; she was more qualified that other women allowed on the trip; and there was an opening for her to go. *Id.*, ¶¶56-60, 68.

**E.   Conclusion**

Plaintiff has fully pled facts that establish each element of her Title IX claim under the Tenth Circuit cases *Escue* and *Simpson*. She has also pled facts that establish each element of a Title IX claim for retaliation. She should be permitted to proceed forward in her case based on her Amended Complaint.

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss.

Respectfully Submitted,


/s/ Dan Curry
Sarah A. Brown, KS# 12130
Dan Curry, KS#22750
Brown & Curry, LLC
406 West 34th Street, Suite 810
Kansas City, MO 64111
(816) 756-5458
(816) 666-9596 (FAX)
sarah@brownandcurry.com
dan@brownandcurry.com

ATTORNEYS FOR PLAINTIFF


## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2016 the foregoing document was served by the Court's electronic filing system upon the following parties of record:


Michael C. Leitch
Megan Walawender
University of Kansas
245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, Kansas 66045

ATTORNEY FOR DEFENDANT

/s/ Dan Curry
Attorney for Plaintiff