**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| DAISY TACKETT, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 16-cv-2266-JTM-GEB |
| | ) |
| UNIVERSITY OF KANSAS, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Defendant the University of Kansas offers the following Reply in Support of its Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6). Plaintiff's claims should be dismissed because the facts in the First Amended Complaint demonstrate that KU was not deliberately indifferent to Plaintiff's allegations of sexual harassment and retaliation. The ultimate questions, with respect to the Title IX claims, are whether the University of Kansas is liable under Title IX for its: (1) alleged failure to prevent the sexual assault of Plaintiff by John Doe G or (2) response to Plaintiff's report of her sexual assault. But for all of her footnotes and claims of "new information," her sexual assault did not occur in the context of a specific university program or event, and the facts remain that when she reported the assault to KU one year later, KU investigated the matter, provided Plaintiff an escort on campus, and issued a no-contact order, and the assailant was removed from campus. Those are not actions of deliberate indifference. Plaintiff's claims lack merit and should be dismissed.

## I.  STANDARD OF REVIEW

Plaintiff attempts to attack Defendant's argument claiming the University relies on "negative inferences" when it points out the absence of facts that would support the type of claim brought by Plaintiff. Yet the fundamental requirement of pleading a case is that the Plaintiff must come forward with enough allegations to state a claim. The absence of such allegations only supports Defendant's argument that, based upon the facts pled, amended and pled again, and those not pled, Plaintiff has failed to state a claim. Similarly it is not sufficient to rely on allegations that are no more than legal conclusions.

### A.  Footnote 4

In footnote 4, Plaintiff spends time addressing "20 references to external evidence, negative pleadings or denials of pleaded fact." Close examination demonstrates that such arguments are without merit, and Defendant's Motion to Dismiss should be granted. For example, in subparts 1, 6, 9, and 12, Plaintiff complains that Defendant incorporates certain documents "only that help its case." Rather, Defendant incorporates three documents to which Plaintiff referred, in accordance with Tenth Circuit law. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013) (on a motion to dismiss a court may consider "documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes its authenticity; and matters of which a court may take judicial notice"). Plaintiff does not dispute the authenticity of any of these documents. These are documents that have been within Plaintiff's possession prior to her initial Complaint, were referenced in her Complaint and are integral to her allegations. Indeed, contrary to the representation Plaintiff makes in Footnote 3 that these facts were "discovered" after September 9, 2016, Plaintiff and her counsel have been in receipt of these

documents for over six months.  *See, e.g.* Exhibit 1 to Defendant's Motion to Dismiss First Amended Complaint.

Similarly in subparts 2 and 3, the University does not rely on these websites as facts *per se*, rather, it included the links to the websites that supplied the data cited by Plaintiff in her Complaint.  In subparts 7, 8 and 13 of Footnote 4, Plaintiff complains of the University's citation to the University's calendar, which was offered to provide context with the overall investigation, and incorrectly claims that the University was required to follow Department of Education timing guidelines, despite legal authority to contrary.  In subparts 4, 5, 10 and 11, Plaintiff takes issue with Defendant's specific denials of certain facts, though Defendant's legal analysis does not rely on the actual denials of those facts, rather that the facts as alleged by Plaintiff do not state a claim.

The remainder are Plaintiff's mischaracterizations of Defendant's position to create strawman arguments and misunderstanding.[1]  The court is allowed to make reasonable inferences stemming from Plaintiff's pled and unpled facts, and Plaintiff's obligation is to allege facts – not legal conclusions – that plausibly state a violation of the law.  Ultimately, Plaintiff's arguments, whether crammed into a footnote or otherwise, fail to do so, and her case should be dismissed.

---

[1] *See* Plaintiff's Footnote 4, subpart 14 (two brief visual encounters, which is consistent which Plaintiff's complaint); 15 (claiming the University alleges it had to "violate [Plaintiff]'s rights or else get sued" (which it did not) and thereby ignoring the fact that the University has multiple obligations to all students and that John Doe G also is entitled to protections under the U.S. Constitution); 16 and 17 (claiming that Coach Catloth denies racial comments, but does not deny calling players fat, which is not the University's position or relevant to liability under Title IX – racial comments are not covered under Title IX, and calling Plaintiff "fat" is not based on gender when weight in a boat is an aspect of rowing competition); 18 (claiming that because Plaintiff did not plead that the alleged comments from Coach Catloth continued after the team meeting, and despite having twice sought leave to amend her Complaint and that none of her filed or proposed pleadings allege that such behavior continued, Defendant should not be able to point that the reasonable inference is that the situation was resolved); 19 (complaining that Defendant referenced that Plaintiff pled additional "facts" based on unspecified "information and belief" in an attempt to avoid dismissal, despite Plaintiff's failure to identify any person who told Coach Catloth of her assault (other than herself in December 2015) as "someone" must have told him in October 2015); and 20 (arguing that Defendant should not be able to point out the entirely legitimate reason of her own request to transfer – which Plaintiff alleged – as explanation her non-selection to the Florida training trip).

## II. ARGUMENT

### A. Plaintiff has not pled facts to support a claim for liability for "before events" under *Simpson*.

Plaintiff cannot establish facts that the University of Kansas is liable because of events before Plaintiff's sexual assault based upon the standard set forth in *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007). While Plaintiff takes great issue with the University's failure to address the *Simpson* case in prior briefings, it was not addressed because it is not applicable to the facts here. Plaintiff's contortion of the holding in *Simpson* is well beyond what the Tenth Circuit or any other Circuit has held. As this court has already recognized, "The deliberate-indifference-to-obvious-need-for-training standard adopted by the Tenth Circuit in *Simpson* for Title IX claims is confined to circumstances where a federal funding recipient *sanctions a specific program* that, without proper control, would encourage sexual harassment and abuse such that the need for training or guidance is obvious. In that situation, the failure amounts to an official policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of the program." *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1339–40 (D. Kan. 2008) (emphasis added).

Other courts have similarly rejected the *Simpson* case as a basis for liability in these circumstances. For example, in *Moore v. Regents of the Univ. of California*, No. 15-CV-05779-RS, 2016 WL 4917103, at *6 (N.D. Cal. Sept. 15, 2016), the court dismissed Plaintiff's claim against her university based upon her claim of inadequate response to sexual violence on campus before her assault. In doing so, the court noted that she failed to allege that the university "had any specific knowledge of a heightened risk of sexual assault either by John Doe or in the particular context in which Moore's assault occurred," and thus, her case was differentiated from *Simpson v. University of Colorado Boulder*, 500 F.3d 1170, 1181–85 (10th Cir. 2007). *See also Facchetti v.*

{L0055832.4}   4

*Bridgewater Coll.*, No. 5:15-CV-00049, 2016 WL 1259415, at *8 (W.D. Va. Mar. 30, 2016) (noting that five other sexual assaults in campus dorms in the preceding year was "simply too tenuous "to satisfy the "actual notice" requirement); *Karasek v. Regents of the Univ. of California*, No. 15-CV-03717-WHO, 2015 WL 8527338, at *9 (N.D. Cal. Dec. 11, 2015) (distinguishing *Simpson*, as "it involved a school's prior knowledge of a 'serious risk of sexual harassment and assault' within a specific context (football recruiting efforts) by a particular group of persons (football players and recruits)" and the school "not only failed to properly supervise the recruiting efforts, it supported and funded them, despite knowing that, without proper control, they would 'encourage' sexual harassment and assault.") (internal citations omitted).

In *Simpson*, multiple female students were sexually assaulted at a party for high-school football recruits, a party that the court determined was "an official school program, the recruitment of high-school athletes." *Id*. at 1173-74. The University of Colorado ("CU") football team brought the high-school players each fall to campus to show recruits "a good time." As part of its recruiting efforts, the high-school recruits were matched with female "Ambassadors," who showed them around campus, and player-hosts, who were responsible for the recruits' entertainment. CU had a number of issues related to sexual assault by football players at these types of events: a national report on a number of sexual assault cases by CU football players, two CU football players were previously charged with rape, reported assaults of high-school girls by football players, the rape of a female trainer by another football player with knowledge of the event by then-coach Gary Barnett. Coach Barnett demonstrated deliberate indifference by discouraging the female trainer from reporting her rape and making the player run a little extra at practice as "punishment." Barnett also hired a former player as an assistant football coach despite his previous ban from CU's campus for assaulting a woman. Prior to the party where Simpson was sexually assaulted, the

district attorney met with CU to express concern that these recruiting parties were leading to the sexual assaults of women, who were being offered to recruits for sex. Tellingly, the Court found that "[t]he coaching staff was informed of sexual harassment and assault by players, and responded in ways that were more likely to encourage than eliminate such misconduct." *Id.* at 1173–74. At the specific party that Ms. Simpson attended, at least some of the high-school recruits who attended had been promised an opportunity to have sex. At the party, five other women, in addition to Simpson were sexually harassed and/or assaulted. *Id.* at 1180.

The Tenth Circuit in *Simpson* found that because "CU sanctioned, supported, even funded, a program (showing recruits a "good time") that, without proper control, would encourage young men to engage in opprobrious acts," summary judgment was not appropriate. Id. at 1177, 1185. The court focused on the events and actions of the head football coach related to the recruiting parties finding that Barnett had prior knowledge of the serious risk of sexual harassment and assault during football recruiting efforts; such assaults had indeed occurred during prior CU recruiting visits and nevertheless, he maintained an unsupervised player-host program for the purpose of showing high-school recruits "a good time" without taking steps to change the program or train the players. In light of this, the Tenth Circuit held that

> A jury could infer that "the need for more or different training [of player-hosts was] so obvious, and the inadequacy so likely to result in [Title IX violations], that [Coach Barnett could] reasonably be said to have been deliberately indifferent to the need.

*Id.* at 1184-85.

The facts alleged by Plaintiff do not remotely resemble *Simpson*. She alleges neither a pattern of assaults by football players at Jayhawker Towers or that her assault occurred at a University-sanctioned event. Here, after being at an off-campus Halloween party, Plaintiff went to the Towers, where a group of KU students had gotten together. John Doe G was there and he

invited her to leave the party and go to his apartment. Plaintiff left and went with John Doe G inside his apartment and was sexually assaulted. The events that led to Plaintiff's assault, while regrettable, were not part of any sanctioned University activity and they are not remotely similar to the sanctioned recruiting events where recruits had been promised sex and provided alcohol and drugs that formed the basis for Title IX liability in *Simpson* or *Jane Does v. Univ. of Tennessee*.[2] The event that placed Plaintiff and John Doe G at the same place was not related to any University sanctioned event—they simply met as part of a group of students hanging out after an off-campus Halloween party. And while Plaintiff tries to make her case appear like *Simpson* by offering allegations that KU has a policy about encouraging female athletes to attend parties with football recruits and that rowers were required to attend football games, nothing about the events alleged suggest that Ms. Tackett ever attended such a party or met a recruit, or that any such parties or recruits have anything to do with her sexual assault case.

Plaintiff's theory—that by operating student apartments and allowing football players to live there, the University somehow encouraged sexual harassment and abuse of female students— is not supported by non-conclusory allegations that KU was deliberately indifferent, and her conclusory claim that there is a longstanding problem of sexual assaults by student athletes connected with the Towers is not supported by her own specific allegations. To establish "knowledge," Plaintiff points to two reports of sexual assaults at the Towers that occurred before

---

[2]  In *Does v. The University of Tennessee*, eight women who, over a period of two years, were each allegedly sexually assaulted and harassed by male university athletes, brought claims under Title IX. As part of their allegations, the plaintiffs claimed that UT football and basketball players engaged in sexual and other misconduct, sometimes in the presence of Athletic Department coaches, including non-sexual assaults, underage drinking, drug use, and other crimes, and that UT has been aware of these incidents and condoned, ignored, or failed to adequately discipline the behavior. The court noted that some of UT's official policies were unique and discriminatory and allowed for UT to manipulate the process to avoid discipline for its male athletes. Like CU, UT encouraged varsity athletes to entertain recruits with alcohol and drugs and give alcohol to under-age women at these parties, without repercussions. UT refused to create a campus-wide program to address sexual assault or train its athletes. No. 3:16-CV-199, 2016 WL 2595795, at *2-*9 (M.D. Tenn. May 3, 2016). Both the recruiting events and the official policies implemented to benefit male athletes were found to be University-sanctioned events.

her assault, and only one of which involved a football player.  This simply is not the fact pattern necessary to establish liability under *Simpson*:  operating student housing where some student athletes live does not equate with "*sanction[ing] a specific program* that, without proper control, would encourage sexual harassment and abuse such that the need for training or guidance is obvious."  Rather, this situation is like those set forth by the Supreme Court in *Gebser* and *Davis* "where, although the [University] might have anticipated that various aspects of its operations would be accompanied by unfortunate incidents of sexual harassment by flawed humans, the [University] cannot be liable in the absence of actual notice of a substantial risk of sexual abuse." *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1340 (D. Kan. 2008).  Here, the University had no such knowledge.

Plaintiff also claims that KU had the requisite knowledge under *Simpson* because of comments made by KU officials.  For example, the co-chair of KU's taskforce on sexual assaults stated that "if you look statistically across the nation on average for each assault reported, eight go unreported."  Plaintiff claims that statement somehow equates with "KU knew that allowing football players to live in Jayhawker Towers was placing women in danger."  Complaint at ¶ 12. First, such an inferential leap is akin to saying that maintaining co-ed housing is now grounds for Title IX liability, which directly contradicts the Supreme Court's decision in *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 649 (1999).  Second, the co-chair's comment is not directed solely to KU, but to the national reporting of sexual harassment and assaults.  The issue of sexual harassment and assaults remains a societal issue that impacts victims of all ages.  *See, e.g.*, CDC Stat Sheet on Sexual Violence at https://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf (noting that 42.2% of female rape victims were raped before age 18, and 37.4 % of female rape victims were raped between the ages of 18-24).  The issue of sexual harassment and assault does

not diminish after leaving college. *See, e.g.*, Donald Trump Fends Off New Sexual Misconduct Claims at http://www.wsj.com/articles/donald-trump-denies-new-sexual-misconduct-claims-calling-allegations-a-conspiracy-1476478799 (last visited 10/19/2016) (to date, nine women have accused presidential candidate of sexual assault). The fact that KU had a task force designed to combat sexual assault and that its employees spoke addressing this societal issue is the opposite of deliberate indifference, and it does not serve as actual notice of a substantial risk of sexual abuse to Plaintiff by housing football players or other male students at the Towers. The University of Kansas did not have actual knowledge or notice that the risk of assault like the one on Plaintiff experienced was "'so great that [the assault] [were] almost certain to materialize if nothing [were] done.'" *Doe v. Blackburn Coll.,* No. 06-3205, 2012 WL 640046, at *9 (C.D. Ill. Feb. 27, 2012) (*quoting Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.,* 551 F.3d 599, 605–06 (7th Cir .2008) and finding that despite prior reported assaults by known and unknown assailants, the school was not liable as it had no actual knowledge of any substantial risk of sexual assault to the student).

Further, Plaintiff's Complaint makes no allegation about what the University did in response to the prior reports of sexual assault and whether such response was adequate. Plaintiff's Complaint does not allege that John Doe G committed any of these prior assaults or that the University was aware that John Doe G had committed them and did nothing about it. Plaintiff's sexual assault resulted because of the exact reason this court has recognized. It was "an unfortunate incident[] of sexual harassment by a flawed human[]" for which the University cannot be liable as there is no evidence of actual notice of a substantial risk of sexual abuse" by allowing student athletes to live in the Towers. *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1340 (D. Kan. 2008).

### B. Plaintiff has not pled facts to support a claim for liability for "after events" under *Simpson* or *Murrell*.

The actions taken by KU after Plaintiff reported her assault do not demonstrate liability under Title IX under the Tenth Circuit's decisions in *Simpson* or *Murrell*. Plaintiff reported the incident to KU approximately one year after it occurred, shortly after another KU student told her she had been sexually assaulted by the same man. Once KU had notice of the issue, it investigated. During the investigation, KU provided Plaintiff with an escort on campus. It also issued a no-contact order to the alleged assailant, and John Doe G was removed from campus. After KU issued the no-contact order to John Doe G, Plaintiff does not allege any further contact from him. Plaintiff does not allege that during the year between the assault and the time she reported it that she experienced harassment from John Doe G. While Plaintiff claims that John Doe G should have immediately been suspended, such non-action does not form the basis of Title IX liability. *Moore v. Regents of the Univ. of California*, No. 15-CV-05779-RS, 2016 WL 2961984, at *5 (N.D. Cal. May 23, 2016) (explaining why plaintiff's attempts to base liability on Dear Colleague Letters for failing to immediately expel John Doe G "simply is misguided" and that the University of California's failure to offer remedial actions were not deliberately indifferent in the absence of claiming that encounters with her assailant were likely).

Plaintiff claims that the case of *Takla v. Regents of the University of California* is most on point to her case and stands for the proposition that failing to immediately ban John Doe G amounts to deliberate indifference. In *Takla*, 2015 WL 6755190 (C.D. Cal. Nov. 2, 2015), the plaintiff was one of several women who alleged years of harassment by a professor, claiming among other things, he wrote her a mediocre Fulbright Fellowship recommendation letter, he stared at her and followed her and a friend around campus. In that case, the court denied a motion to dismiss a Title IX claim because the defendant university's allegedly deficient response actively discouraged the

student from filing a written request for a formal investigation and then resolved her complaint through an "Early Resolution" process, which violated the university's own policies, resulted in no formal findings, no other documentation, and, no discipline. 2015 WL 6755190, at *1, *5-7. *Takla* is simply not analogous to Plaintiff's alleged facts.

Similarly distinguishable from Plaintiff's claim of deliberate indifference following her report are the post-assault events in the *Simpson* case. After the report of the party at which Simpson and the five other women were assaulted, CU's football program, and in particular, Head Coach Gary Barnett, allowed the four current players identified as assailants to play for the National Championship in the Fiesta Bowl. 500 F.3d at 1184. Coach Barnett also continued to recruit and push for the admission of one of the recruits involved in the assaults. Barnett and his staff also interfered with the investigation into the assaults of the six women and resisted recruiting reforms, claiming that it would be a "competitive disadvantage." Id.

While the record of KU's actions is not fully developed at this early stage, the facts that are alleged show no evidence of deliberate indifference toward Plaintiff or other students following her report. John Doe G never played in another football game and was permanently removed from campus. Plaintiff was provided an escort, and a no contact order was issued. As alleged by Plaintiff's teammate, Jane Doe 7 in her First Amended Complaint, "On November 2, 2015, the entire rowing team was required to attend a sexual assault education meeting." Similarly, within Plaintiff's Proposed Exhibit 6 to her Motion for Leave to File Second Amended Petition is Dr. Durham's letter, in which she states, "I personally met with the entire football team twice in the Fall Semester to provide training on sexual harassment and sexual violence. Along with the Director of the Sexual Assault Prevention and Education (Center) (SAPEC), I also met with the entire football team at the beginning of March to provide training. Further, the Director of SAPEC

will be returning to provide further education to the team surrounding sexual harassment and consent in April." In addition to the specific investigation conducted, services offered to Plaintiff, and removal of her assailant, she cannot show that the University was deliberately indifferent to establish Title IX liability for events either before or after her sexual assault.

### C. Plaintiff's Remaining Claims of Harassment and Retaliation Must Be Dismissed[3]

Plaintiff also goes on to claim that she should recover for Title IX liability for the actions of her rowing coach, that the University ignored complaints about Coach Catloth's behavior and his "fat" commentary, and that when she complained she was retaliated against.

As to her claim for Title IX harassment stemming from her allegations involving Coach Catloth, those claims fail as a matter of law. None of the alleged racial claims are prohibited by Title IX, and supposedly calling some Division I athlete "fat" is not indicative of any sexually discriminatory motive and therefore is also not covered by Title IX. Moreover, the alleged remarks do not rise to the level of "severe, pervasive, and objectively offensive" as required for liability, and the First Amended Complaint demonstrates that the University was not deliberately indifferent to the athletes' complaints as there are no allegations that such comments continued after the team meeting.

As set forth in Defendant's Motion to Dismiss the First Amended Complaint, the various allegations related to her claim for retaliation fail to state such a claim as she has not established protected activity, a causal nexus, or that KU remained deliberately indifferent. KU's interim IOA director Joshua Jones responded to the concerns of Plaintiff's father confirming awareness of

---

[3] Plaintiff's Response includes allegations that are part of her proposed Second Amended Complaint, which has not yet been ruled on. To the extent Plaintiff relies on allegations that are not within the First Amended Complaint, such argument is improper, and Defendant will address those arguments if the Court decides to give Plaintiff leave to amend again. *See also* Defendant's Response to Plaintiff's Motion for Leave to File Second Amended Petition (discussing futility and plaintiff's and her counsel's prior knowledge of the facts in proposed amendments).

Plaintiff's initial placement on the standby list for the trip and confirming that such decision was made without consideration of Plaintiff's IOA complaint. FAC at ¶¶ 64-65. In light of her intent to transfer, Plaintiff's ultimate non-selection is not an act of retaliation. For purposes of brevity, Defendant will not repeat all of the arguments it previously briefed in support of its position and will simply incorporate those by reference.

There is one overarching theme in the retaliation claim that Plaintiff fails to address: that there was an intervening non-retaliatory reason for the supposed retaliatory events. First, her non-selection for the rowing trip followed her December 2015 pronouncement that she intended to transfer to another University. According to her version of the events, she was one of many girls who spoke out at a meeting where players expressed a number of concerns. Yet none of the other teammates who spoke were not selected for the January 2016 rowing trip—only Plaintiff. Notably, in December 2015, Plaintiff had told the Coach that she intended to transfer; thus, to take her on the training trip would deprive another teammate who intended to remain on the team. Plaintiff cannot plausibly claim that she was entitled to go on the trip despite indicating she intended to leave the University or that she was similarly situated to rowers staying at KU; her non-selection was not retaliation. Second, after ignoring all of the remedial efforts IOA did on her behalf to refund her housing and tuition, Plaintiff fails even to address why the University's compliance with federal financial aid laws would not be a legitimate non-retaliatory reason to seek the return of her advanced financial aid. Because Plaintiff's allegations also provide an independent, non-retaliatory reason for these actions, her Complaint undercuts any plausible inference of retaliation. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012).

### III.     CONCLUSION

Plaintiff's First Amended Complaint does not establish that the University of Kansas was deliberately indifferent either before or after her sexual assault.  The University did not have specific knowledge of any particular risk of Plaintiff's sexual assault.  Her sexual assault did not occur in the context of any specific University-sponsored or funded program or event, and providing student housing does not create liability under *Simpson*.  If it did, the University would be automatically liable for any sexual assault that occurs in the privacy of a student's dorm or bedroom.  Title IX does not create such liability.  When she reported her assault, KU investigated, provided interim relief measures such as an escort on campus and a no-contact order, and when the investigation was complete, the assailant was removed from campus.  In short, KU took action.  That action is not deliberate indifference, and deliberate indifference – not perfection or negligence – is the standard for liability under Title IX.  Plaintiff's First Amended Complaint should be dismissed.

Respectfully submitted,

/s/ Megan K. Walawender
Michael C. Leitch, Kansas Sup. Ct. #19588
Megan K. Walawender, Kansas Sup. Ct. #22955
Associate General Counsel and
   Special Assistant Attorney General
Room 245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, Kansas  66045
Tel:  (785) 864-3276;   Fax:  (785) 864-4617
Email:  mleitch@ku.edu
            Megan.walawender@ku.edu

*Attorneys for Defendant*

Date:   October 21, 2016

**CERTIFICATE OF SERVICE**

      I certify that on October 21, 2016, I electronically submitted this document with the Clerk of the Court using the CM/ECF system, with notice of filing generated automatically and emailed to:

Dan Curry
Sarah Brown
BROWN & CURRY, LLC
406 W. 34th Street, Suite 810
Kansas City, MO 64111
dan@brownandcurry.com
sarah@brownandcurry.com
*Attorneys for Plaintiff*

    /s/ Megan K. Walawender
    *Attorney for Defendant*
    *University of Kansas*