## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DAISY TACKETT,

       Plaintiff,

v.

                                                                  Case No. 16-2266-JTM

UNIVERSITY OF KANSAS,

       Defendant.

### MEMORANDUM AND ORDER

This is an action against the University of Kansas ("KU") under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. Before the court is KU's Motion to Dismiss First Amended Complaint (Dkt. 25) and plaintiff's Motion for Leave to File Second Amended Complaint (Dkt. 28). For the reasons stated below, the court grants in part and denies in part defendant's motion to dismiss, and grants plaintiff's motion for leave.

**I.    Factual Background[1]**

The First Amended Complaint ("FAC") alleges that in the Fall of 2014, plaintiff enrolled at KU as a scholarship member of the school's rowing team. During that school year, after attending a Halloween party, plaintiff went to the Jayhawk Towers, where a group of KU students and athletes had gathered. Joe Doe G ("JDG"), a KU football player and a resident of the Jayhawk Towers, was also at the gathering. He invited plaintiff into his apartment to watch television and she agreed. While there, JDG allegedly raped plaintiff. Plaintiff did not report the

---

[1] The facts below are based on the First Amended Complaint and, where applicable, her proposed second amended complaint, because the court accepts the well-pleaded, nonconclusory factual allegations in the complaint as true when ruling on a motion to dismiss. Fed.R.Civ.P. 12(b)(6).

sexual assault at the time, but did tell a teammate about the incident. Throughout the rest of the school year, she experienced panic attacks on campus and when practicing at KU's football stadium. She tried to have a normal college experience by attending classes, participating in student senate and the KU rowing team, but took measures to avoid meeting JDG on campus.

Plaintiff returned to KU and the KU rowing team the following academic year (2015-16). The head coach of the KU rowing team was and remains Rob Catloth, and the assistant coach was Carrie Callen.

In early October of 2015, many members of the rowing team, including plaintiff, met with a KU sports psychologist to discuss their concerns about Coach Catloth's alleged racist remarks and his "relentless" commentary on their weight and body shape. They also discussed their concern that their reports to KU administrator Debbie Van Saun regarding Coach Catloth's conduct were being ignored. The next week, following a competition, Coach Catloth, Asst. Coach Callen, Van Saun, and the rowing team assistant coach told everyone who participated in the meeting with the psychologist to remain and tell them what had been said.

Later in October 2015, Sarah McClure, another KU rowing team member, told plaintiff that JDG had recently sexually assaulted her at the Jayhawk Towers and that she had reported the assault to the police and to KU. After learning of McClure's attack, plaintiff reported her assault to the rowing team's trainer, who referred her to a KU Athletics Department physician, who referred her to Van Saun, who set up a meeting between plaintiff and KU's Institutional Opportunity & Access ("IOA") office. The meeting was scheduled at the same time as a KU rowing team practice. Plaintiff informed both Catloth and Callen that she needed to miss practice to attend the IOA meeting.

After meeting with the IOA investigator, plaintiff encountered JDG on campus at Blake Hall. He stared her down. Plaintiff reported the encounter to the IOA investigator. Later that same week, plaintiff saw JDG in front of Watson Library, where he stared her down and called her a derogatory name. Plaintiff also reported this encounter to the IOA investigator. KU did not issue JDG a no-contact order until months after plaintiff reported her assault and only after she sent a letter specifically demanding its issuance. During October, November and December of 2015, plaintiff's anxiety and panic attacks worsened and would frequently manifest during workouts at the KU football stadium.

In early December of 2015, Coach Catloth informed plaintiff that he would not allow her to attend the annual winter training trip in Florida later that month. Plaintiff told him about her rape, the continuing investigation, what she had been coping with, how much the trip meant to her, and asked him what she needed to do to go on the trip. He told her she had to get a specific time on a 2K-test. Despite passing the test the very next day, Coach Catloth excluded plaintiff from the list of rowers attending the training trip. Sarah McClure was also not on the list.

Plaintiff met with the coach and showed him the team test results. Even though she was faster than many of the players on the list, Coach Catloth refused to permit her to attend the winter training. Plaintiff then requested Coach Catloth provide her a letter that would permit her to transfer to another school if necessary. She told him that the rape and stalking (i.e., the two staring encounters at school), in addition to the rowing team issues, may force her to leave. Coach Catloth told her he would give her a transfer letter, but would not permit a transfer to another Big 12 school.

Plaintiff informed KU's IOA office of Coach Catloth's decision to block her participation in winter training and block her transfer to another Big 12 school, and that she considered these

decisions retaliatory in nature. Joshua Jones, KU's interim director of IOA, responded in pertinent part, that athletics make those type of decisions without consideration of any pending IOA matters. SAC, ¶ 65. He encouraged plaintiff to continue her dialogue with her coach. Even though an extra spot opened on the training trip, Coach Catloth did not allow plaintiff to attend.

After winter break, plaintiff returned to KU for the January 2016 semester. She attended approximately one week of school. KU still had not suspended or expelled JDG or concluded its investigation. Plaintiff decided she had no choice but to withdraw from KU. She told Coach Catloth that she did not want to quit, but that she needed to leave KU until the assault investigation was completed. He told her not to worry about returning her equipment. The Interim IOA director told plaintiff that KU would allow her to withdraw from the university without having to pay for the rest of the semester. Plaintiff returned home to Florida.

In February of 2016, plaintiff received an email from the rowing coaches for the return of equipment, mostly team-wear. She also received a letter from KU that indicated she would be billed for the semester and that non-payment would result in collections. KU also placed an administrative hold on plaintiff's transcript.

On February 23, 2016, KU sent plaintiff a letter stating the investigation was completed and that it had recommended to Student Affairs that JDG be permanently expelled from KU. On March 16, 2016, KU represented that JDG agreed to an immediate expulsion to avoid the hearing scheduled on March 21, 2016.

On March 18, 2016, KU sent plaintiff a letter, stating: "This letter confirms that this matter has been resolved to your satisfaction, without a hearing on the following terms:

- [JDG] has been effectively permanently expelled from [KU]. He was withdrawn from the University effective March 17, 2016. He is not eligible for readmission.
- A notation will be placed on [his] transcript.
- [JDG] has been banned from campus for a period of ten years.

●The no contact directive … will remain in place…"

Proposed SAC, Ex. 3.

Plaintiff later discovered that KU allowed JDG to withdraw in lieu of expulsion, which facilitated JDG's subsequent enrollment at Indiana State University and enabled him to join that institution's football team. Plaintiff alleges, among other things, that KU's concealment of the actual outcome displays deliberate indifference to her rights under Title IX.

On March 21, 2016, plaintiff filed suit against KU in state court, alleging a hostile educational environment (Count I) and retaliation (Count II) under Title IX. On April 25, 2016, KU removed this case to federal court. On May 27, 2016, in lieu of filing an answer, KU filed a motion to dismiss the petition for failure to state a claim. Dkt. 10.[2] Plaintiff sought and obtained leave to file an amended complaint. Dkts. 17 and 22. KU then filed a motion to dismiss the First Amended Complaint. Dkt. 25. In addition to filing an opposition to the motion to dismiss, plaintiff sought leave to file a second amended complaint. Dkts. 28 and 30.

## II. Standard for a Motion to Dismiss and For Evaluating a Motion to Amend on Grounds of Futility

The Federal Rules of Civil Procedure provide that a party may amend his or her pleading once as a matter of course or, after a responsive pleading has been filed, "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The decision whether to grant leave to amend is within the discretion of the district court. *Hayes v. Whitman*, 264 F.3d 1017, 1026 (10th Cir. 2001). The court may justifiably refuse leave to amend on the grounds of undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or futility of the

---

[2] This motion is moot in light of the First Amended Complaint (Dkt. 22). Accordingly, the court denies KU's motion to dismiss the petition (Dkt. 10) as moot.

5

proposed amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). A motion to amend may be denied as futile "if the proposed amendment could not have withstood a motion to dismiss or otherwise failed to state a claim." *Schepp v. Fremont County*, 900 F.2d 1448, 1451 (10th Cir. 1990). Thus, the standard for a motion to dismiss for failure to state a claim upon which relief can be granted governs both plaintiff's motion to amend and defendant's motion to dismiss.

Rule 12(b)(6) allows dismissal of a complaint only where it appears that the facts alleged fail to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying and affirming *Twombly's* probability standard). Complaints containing no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" may not survive a motion to dismiss. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). The court must assume that all allegations in the complaint are true. *Twombly*, 550 U.S. at 589. "The issue in resolving a motion such as this is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

### III. Discussion

#### A. Preliminary Matters

Plaintiff argues that KU's motion relies on at least 20 references to external evidence, negative inferences, or denials of pleaded facts. She urges the court to disregard these 20 references or treat the motion as a Rule 56 summary judgment motion after permitting her the opportunity to conduct discovery. The court agrees that KU's motion contains arguments and

references that arguably warrant converting it to a motion for summary judgment. The court, however, will simply ignore these arguments or references and resolve the motion as a motion to dismiss. *See Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998) (courts have broad discretion in determining whether or not to accept materials beyond the pleadings).

**B. Motion to Dismiss**

**1. Title IX, In General**

Title IX provides, in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Discrimination under Title IX is not limited to disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d Cir. 2003). It encompasses sexual harassment that creates an educational environment sufficiently hostile to deprive the student of access to the educational opportunities or benefits provided by the school. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) (Title IX prohibits federal fund recipient's deliberate indifference to known acts of teacher-on-student harassment); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) (Title IX encompasses a claim for damages due to a sexually hostile educational environment created by a fellow student or students when the supervising authorities knowingly fail to act to eliminate the harassment). The requirements for a Title IX claim vary from case to case. *See Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1177 (10th Cir. 2007) (actual notice standards established in *Gebser* and *Davis* do not apply in cases that involve official school policy). Courts have adopted Title VII standards in analyzing Title IX claims. *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).

### 2. Hostile Educational Environment (Count I)

To state a Title IX claim for hostile educational environment based on gender, a plaintiff must allege: 1) she was a student at an education institution receiving federal funds, 2) she was subjected to harassment based on her sex, 3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and 4) there is a basis for imputing liability to the institution. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999). To establish institutional liability, the plaintiff must show that "an official who ... has authority to address the alleged discrimination and to institute corrective measures on the [institutional] recipient's behalf has actual knowledge of discrimination ... and fails adequately to respond." *Gebser*, 524 U.S. at 290.

#### a) Student-on-Student Harassment

KU urges the court to dismiss plaintiff's hostile environment claim based on JDG's harassment on two grounds: 1) failure to allege facts that KU had actual notice of ongoing harassment by JDG, and 2) failure to allege facts that KU was deliberately indifferent to her complaint against JDG. KU argues that plaintiff has simply alleged "a single tragic incident of sexual assault" that happened more than a year before plaintiff made KU aware of it, which does not a state a claim for institutional liability under Title IX. *But see City of Canton v. Harris*, 489 U.S. 378, 409 (1989) (evidence of a single violation of rights did not forceclose possibility of municipal liability). KU also argues that generalized knowledge of past harassment is insufficient for Title IX liability.

#### (1) *Simspon* liability for Conduct Before the Rape

Plaintiff argues that she has pled facts to support a claim for institutional liability under *Simpson* because KU had prior knowledge of a heightened risk of sexual assault at Jayhawk Towers due to its official policy of placing football players in Jayhawk Towers, where they

8

would receive less supervision than in other residence halls. The court disagrees. *Simpson* is factually distinguishable. In *Simpson*, the University of Colorado Boulder (CU) sanctioned, supported, even funded, a program to show recruits a "good time." *Simpson*, 500 F.3d at 1173, 1177. CU paired visiting recruits with female-student ambassadors to entertain the recruits. *Id.*

Plaintiff attempts to graft *Simpson* liability by alleging KU required its female rowers to attend football games and cheer for the players as they entered the field, even if the rowers had been sexually assaulted by the players. SAC, ¶¶ 70-71. Plaintiff also alleges that KU has an official policy and practice of entertaining football recruits in hotel just off campus and encouraging female KU athletes to attend parties with the recruits. *Id.*, ¶ 72. But these alleged policies played no part in plaintiff's rape. Encouraging attendance and cheering at football games is not the equivalent of pairing female students with recruits to show them a good time. Plaintiff's rape did not occur while attending a KU football game or during a recruiting event, nor was she a student ambassador paired with recruits or football players. There are no allegations that the Halloween party or the gathering at the Towers were university-sponsored or sanctioned, or that KU somehow encouraged the misconduct. Thus, plaintiff's rape did not occur in the context of any of those policies.

As for KU's policy of housing football players at Jayhawk Towers, the court concludes that allegation alone is insufficient to state a claim for institutional liability. Plaintiff essentially seeks institutional liability based on the school's authority over its athletes and that it "should have known" of the heightened risk of assault at Jayhawk Towers based on the stereotypical assumption that football players are more prone to commit sexual assault. Stated differently, plaintiff seeks liability based on theories of respondent-superior and constructive notice. The

9

Supreme Court, however, rejected both these theories of liability in *Gebser*, 524 U.S. at 282. The court concludes the FAC fails to state a plausible *Simpson* claim against KU.

### (2) Liability for KU's Conduct After the Rape

KU urges the dismissal of plaintiff's deliberate indifference claim based on KU's conduct after plaintiff reported the rape on three grounds: 1) KU's response to her report was not deficient in light of the winter break, plaintiff was provided an escort, and a no-contact order was issued; 2) plaintiff failed to allege any severe, pervasive, and objectively unreasonable harassment by JDG during the investigation; and 3) KU's action showed a respect for due process. While KU may have legitimate reasons for its actions or excuses for its inaction, plaintiff's factual allegations nonetheless support an inference that KU was deliberately indifferent to her report of harassment. At this stage, the court is not concerned with whether plaintiff will ultimately prevail, but whether she is entitled to offer evidence to support that claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (likelihood of recovery is not the test at the motion to dismiss stage). Plaintiff has pled sufficient facts to allow her to offer evidence to support this claim even if recovery might appear remote on the face of the pleadings.

### b) Coach-on-Student Harassment

KU urges the dismissal of plaintiff's hostile environment claim based on Coach Catloth's comments on three grounds: 1) the alleged offending comments do not constitute harassment on the basis of sex, 2) the alleged comments are not severe, pervasive, and objectively offensive; and 3) the FAC fails to demonstrate deliberate indifference to the athletes' complaints. Dkt. 25 at 24. The court agrees that Coach Catloth's offending comments may be sports-related and that there is a remote possibility of plaintiff being able to establish that these comments were sex-based. Nonetheless, the allegations that these comments also attacked body shape support an

10

inference these comments were sex-based. The allegations regarding a team meeting with a sports psychologist to discuss Coach Catloth's inappropriate comments (FAC, ¶ 28) and that there was an attempt to implement a policy requiring Coach Catloth to refer his rowers to a nutritionist rather than calling them "fat" (FAC, ¶ 32) could, depending on the surrounding circumstances, support a finding that Coach Catloth's harassment was severe, pervasive, and objectively offensive. Finally, the allegations that KU official Van Saun ignored the complaint against Coach Catloth and did not investigate it support a finding of deliberate indifference. For these reasons, the court denies dismissal of this claim at this time.

### 3. Retaliation (Count II)

It is well-settled that retaliatory conduct is within the broad prohibition of "discrimination" made unlawful by Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). To date, the Tenth Circuit does not appear to have expressly set forth the elements for a retaliation claim under Title IX. Courts that have addressed the issue have analyzed both Title IX discrimination and retaliation using Title VII standards. This means that to state a claim for retaliation under Title IX, a plaintiff must allege that: 1) he or she engaged in protected activity; 2) defendant had knowledge of the protected activity; 3) materially adverse school-related action was taken against plaintiff; and 4) there was a causal connection between the protected activity and the adverse action. *Yan v. Penn State Univ.*, 529 F. App'x. 167, 171 (3d Cir. 2013); *Scott v. Metropolitan Health Corp.*, 234 F. App'x. 341, 346 (6th Cir.2007). The first step in any assessment of a retaliation claim is to identify what conduct, if any, a reasonable jury could causally link to the existence of retaliatory animus. *S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 806 (W.D. Pa. 2016). Such animus is by its nature (1) intentional conduct aimed at

inflicting injury or harm (2) taken because of a complaint about a perceived form of prohibited conduct. *Id.*

Plaintiff alleged the following adverse actions: 1) Catloth blocked her from participating in the winter training, 2) KU made misrepresentations to Tackett that concealed the fact that KU was letting JDG withdraw from school, 3) KU sent letters demanding that she pay tuition and return rowing gear, and 4) KU placed holds on her records. Dkt. 30 at 29. The court finds the FAC's allegations insufficient to infer that the latter three acts were intentional conduct aimed at inflicting injury to plaintiff because she reported the sexual assault and Coach Catloth's inappropriate comments. The court agrees with defendant that demanding payment for tuition, demanding the return of equipment, or placing a hold on transcript are standard practices when a student withdraws from school. The court finds no basis to infer that KU did any of these acts to plaintiff with retaliatory animus. Likewise, there is no basis to infer KU misrepresented JDG's punishment in retaliation for complaining about the sexual assault.

Nonetheless, the court will not dismiss plaintiff's retaliation claim at this time. The FAC sufficiently alleges facts to support a finding that Coach Catloth denied plaintiff the opportunity to participate in winter training because she complained about his inappropriate comments at the team meeting with the KU psychologist. Defendant's arguments as to this adverse action focus on inconsistencies in the timeline and the level of McClure's involvement. At this time, the court will make all inferences in favor of plaintiff. Accordingly, plaintiff's retaliation claim survives dismissal.

### C. Motion to Amend

Plaintiff seeks leave to add factual allegations that KU misrepresented to her the punishment JDG received to further support her claim that KU was deliberately indifferent to her

12

right under Title IX. KU objects to the proposed amendments on two grounds: 1) Tackett knew about most of these alleged facts for months, and 2) these allegations are futile. Dkt. 34 at 1. Because this case is in the early stage of litigation, the court finds no undue delay in seeking to add these allegations. The court also finds no undue prejudice in allowing the amendments because: 1) they simply bolster Tackett's deliberate indifference claim and do not raise a brand new claim, and 2) KU relies upon some of the same letters in support of its motion to dismiss. Finally, having concluded that the FAC survives dismissal, the court finds the proposed amendments are not futile for the same reasons. Accordingly, the court grants plaintiff leave to file her proposed SAC.

**IT IS THEREFORE ORDERED** that Defendant's Motions to Dismiss (Dkt. 10) is **DENIED** as moot; that Defendant's Motion to Dismiss FAC (Dkt. 25) is **GRANTED IN PART** and **DENIED IN PART**; and that Plaintiff's Motion for Leave to File Second Amended Complaint (Dkt. 28) is **GRANTED**.

**IT IS SO ORDERED** this 10th day of February, 2017.

s/ J. Thomas Marten
Chief United States District Judge
